**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO: 19-CV-80825-DMM**

JENNIFER QUASHA, on behalf of her
son, H.Q., a minor

      Plaintiffs

vs.

CITY OF PALM BEACH GARDENS, FLORIDA

      Defendants
_____/

## EXPEDITED MOTION FOR PRELIMINARY INJUNCTION

COMES NOW, the Plaintiff, JENNIFER QUASHA, on behalf of her son, H.Q., by and through undersigned counsel, and pursuant to Fed. R. Civ. P. 65(a) and 42 U.S.C. § 12188(a)(2) hereby files this Motion for a Preliminary Injunction against Defendant, CITY OF PALM BEACH GARDENS, FLORIDA (hereinafter "City"), requesting that the Defendant be enjoined from selling peanuts, directly or thought their licenses at the Gardens park prior to or during the days in which H.Q. plays T-Ball, states as follows:

### I.    Introduction

This matter involves a reasonable accommodation request on behalf of a six year-old boy who would like to be a part of a T-Ball league in the City of Palm Beach Gardens, and cannot participate because the City of Palm Beach Gardens insists on the ability to sell peanuts at the City's recreation facility at Gardens Park. The registration for the league has already begun, and the league starts in September.  H.Q. would like to play with his friends in the Fall T-Ball program. Notwithstanding the fact that H.Q.'s accommodation was granted when he was five, when he

*Disability Independence Group, Inc. * 2990 Southwest 35th Avenue * Miami, Florida 33133*

became six years of age, the defenses have ranged from an allergy is not a disability, they have no control over the T-Ball league, H.Q.'s presence in the league would be a direct threat to himself, to the fact that peanuts are fundamental to the game of baseball (T-ball).  Instead, the Defendants offered that he play at a neighboring city.  Ensuring full access to the fabric of American communities, *especially* little league baseball, was the intent of the framers of the ADA, and was explicitly in the remarks made by President George H.W. Bush when he signed the ADA into law.[1] There is no reason why H.Q. should not be permitted to play T-Ball with his friends *this Fall* in the City of Palm Beach Gardens, and not be precluded from home-town ball until the eventual conclusion of this case.

## II.    Facts and Background

### A.  H.Q. and his Disability

H.Q. is a six year-old boy who turns seven in December.  He will be entering into first grade in the Fall. See Declaration of Jennifer Quasha (Quasha Decl. attached hereto as Exhibit "1") ¶ 3. H.Q. and his family reside in the City of Palm Beach Gardens, Florida, and H.Q. goes to public school in the City of Palm Beach Gardens. *Id.* at ¶ 2, 13.  Ms. Quasha discovered that H.Q. had severe allergies to tree-nuts and peanuts, when he was four years old and H.Q. tried cashews and became red around the mouth and experienced throat tightness. *Id.* at ¶ 6-7. H.Q. was transported to the hospital in an ambulance. *See* Quasha Decl. ¶ 5. They heard him wheezing and brought him to the hospital. Id at ¶ 6 and Exhibit "A" attached to the Decl. When he he as an allergic reaction, H.Q.'s throat closes up and/or he gets hives. His lips and eyes can become swollen and his throat tighten up. *Id.* at 7.

---

[1] https://www.eeoc.gov/eeoc/history/35th/videos/ada_signing_text.html (last accessed August 4, 2019)

After the hospital incident, in 2017, Ms. Quasha took H.Q. to an allergist to verify the allergy and the extent of the allergic reaction. *Id.* After verifying the severe allergy, Ms. Quasha was taught an anaphylaxis action plan in the event that H.Q. came in contact with an allergen. *Id.* at 10.    H.Q. has a severe reaction whenever he eats an allergen, or puts his fingers in his mouth after touching an item. *Id.* at 11. H.Q.'s allergist prescribed H.Q. an epinephrine pen and other medications to use in emergencies, and Ms. Quasha spends "every moment trying to protect" her son. *Id.* at 10.

Ever since his allergies were diagnosed, H.Q.'s public school has had no problems in accommodating his disability.  The school maintains no-nut classrooms and has separate tables for students with nut allergies in the cafeteria. *Id.* at ¶ 13. When food is brought into the classroom, his teachers contact Ms. Quasha to check the ingredients to ensure H.Q. won't have an allergic reaction. *Id.*

### B.     The City of Palm Beach Gardens Programs and Services

Adjacent to the City Hall Complex, the City owns and operates Gardens Park located at 4301 Burns Rd., Palm Beach Gardens, FL.   According to the Palm Beach Youth Athletic Association (PBGYAA) Baseball which H.Q. wanted to play in, they publish as follows:

> Palm Beach Gardens Baseball Recreation Program is affiliated (by Charter) with Cal Ripken / Babe Ruth Leagues. We are committed to maintaining and managing a safe and enjoyable recreation program. It is our intention to provide a program which teaches baseball fundamentals, respect, sportsmanship, discipline, teamwork, leadership and a competitive spirit. Contact Executive League Director Sean Saunders for further information.
>
> Our practices and games are played at **Gardens Park**. Click here for the location. These facilities are exceptionally maintained, and feature:
> - 8 lit fields with dugout lighting
> - Manicured grass infields
> - Red clay playing surface
> - Protective netting for spectator viewing

- Bleachers with sun protection
- Wireless Internet
- Scoreboards
- 8 batting cages
- Bull pens on each field
- PA System for each field
- Multiple soft-toss stations
- 2 concession stands
- Fire/Emergency/Police stations on property
- Ample parking
- "Green Monster" home run fence with integrated traditional scoreboard on Field 3
- 2 playgrounds and 2 covered party pavilions

The program is designed for players ages 4 through 15 years old:
- T-Ball League – ages 4, 5 and 6
- Rookie League – ages 7 and 8
- Minor League – ages 9 and 10
- Major League – ages 11 and 12
- Senior League – ages 13, 14, and 15

As noted in the Palm Beach Gardens brochure of the City's recreation program and activities, the City recognizes the Palm Beach Youth Athletic Association (PBGYAA) as the "City's recognized provider of youth recreational sports leagues."[2]  The Palm Beach Gardens Youth Athletic Association sanctions eight sports: Baseball, Basketball, Cheerleading, Flag Football, Football, Lacrosse, Soccer and Softball. In the City's brochure, the City has resident and non-resident fees, and states as follows:

> Most Recreation Department programs offer a resident and a non-resident fee. To be eligible for the discounted resident fees, a participant must reside within incorporated Palm Beach Gardens and support city facilities and programs through property taxes. Some addresses will list Palm Beach Gardens as the city of residence but are not actually within incorporated Palm Beach Gardens.[3]

Further, the city offers ADA accommodations to the participants in its recreation programs. *Id.*

---

[2] Fall 2019 Gardens Life Brochure, p. 9, found at https://www.pbgfl.com/DocumentCenter/View/12408/Gardens-Life-Brochure-FALL-2019-PDF, last accessed 8/4/2019
[3] *Id.* at p. 27.

The PBGYAA states on their home page, that they are "a non-profit 501(C)(3) organization with more than 1,500 kids playing in our eight Recreation Leagues. We work closely with the City of Palm Beach Gardens, who provides us with the best sports facilities in the county."[4] According to their by-laws, registration of city residents have priority for all of their programs, and the PBGYAA works closely with the City, and children who reside outside of Palm Beach Gardens can only participate if space permits, and approved by the sports division president.[5] As with the other programs of the City, people who are non-residents of the city are required to pay a non-resident fee for all programs and services of the PBGYAA.[6]

### C. H.Q.'s Participation in the T-Ball Program

Around the end of August 2018, Ms. Quasha signed H.Q. up to play T-ball through the PBGYAA. *See* Quasha Decl. ¶ 14. On September 21, 2018, when Ms. Quasha brought H.Q. to play T-Ball, she noticed that peanuts were sold at Gardens Park during the boys' game. *Id.* at ¶ 16. There was a practice of throwing the peanut shells on the floor of the dugout and benches in the dugout, and Ms. Quasha became scared that sitting in and being around peanuts would cause H.Q. to have an allergic reaction. *Id.* ¶ 16. The next morning, Mrs. Quasha requested an accommodation to Seth Abrams, who was the president of PBGYAA Baseball that stated:

> Hello, my son [H.Q] is deadly allergic to peanuts. He is playing t ball this season and I notice the peanut shells all over the dugout and at the concession stand. The lady who works the concession suggested I email you. I've heard they've taken the peanuts away in the past for kids with allergies. Thank you so much.
> Jennifer and Michael and Quasha.

---

[4] https://www.pbgyaa.com/ (last accessed 8/4/2019)
[5] https://www.pbgyaa.com/wp-content/uploads/2017/07/By-Laws-Signed.pdf , page 16 (last accessed 8/4/2019)
[6] http://www.pbgbaseball.com/FAQ.html (last accessed 8/4/2019); see also
https://clubs.bluesombrero.com/Default.aspx?tabid=41657 (last accessed 8/4/2019)

*Id. at* ¶ 17. Mr. Abrams claimed that he could not stop selling peanuts because "its baseball." *Id.* at 19. Further, Mr. Adams stated that maybe T-Ball isn't the sport for H.Q. because of his peanut allergy. *Id.* at 21. Ms. Quasha was upset. *Id.* at ¶ 19.

After Seth Abrams denied the requested accommodation, Mrs. Quasha's husband, Michael Quasha, spoke with the city manager of the City of Palm Beach Gardens, Ron Ferris, who offered three accommodations: (1) the dugouts be swept each day prior to first use of the day; (2) all of H.Q.'s Fall T-ball games be scheduled as the first game of every game day; and (3) the park not sell any peanuts until the conclusion of H.Q.'s games. *Id.* at ¶ 18. Thereafter, Mr. Tony Badala, President of PBGYAA, emailed Ms. Quasha and offered to assist. *Id.* at ¶ 20. He assured that there would not be a problem, and that the dugouts would be swept, and peanuts would not be sold until after H.Q.'s game. *Id.* at 22. Thereafter, the accommodation was granted. *Id.* at ¶ 22. There was no problem at all with compliance with the accommodations, and H.Q. was able to play T-ball in Fall 2018, without issue. *Id.* at ¶ 24. H.Q. made many friends playing T-ball and enjoyed playing it so much that he requested to play again in the Spring of 2019. *Id.* at ¶ 25.

On January 10, 2019, Ms. Quasha made a request that H.Q. be on the same team as his friend M.A. because M.A.'s parents are a physician assistant and a nurse practitioner and they know the signs of an allergic reaction, know how to react, and can administer H.Q.'s epi-pen. *Id.* at ¶ 26. Ms. Quasha was told that there were no exceptions to the new "no request" policy, even for medical reasons. *Id.* at ¶ 26. On January 14, 2019, since Mr. Badala solved the issue the prior season, Ms. Quasha emailed Mr. Badala, stating that H.Q. would be playing T-ball again in the Spring and requested accommodations for H.Q. *Id.* at ¶ 27.

> Hi Tony,
> Our son [H.Q.] really wanted to sign up for t ball again.  I know it is an extra
> responsibility for you guys so I greatly appreciate.  Also, is it possible since they

don't do evaluations to put him with [M.A.]?  He is our neighbor. If I have to leave
[H.Q.] to take my other kids somewhere they are in the medical field and can handle
his allergies.  I know they aren't taking any friend requests anymore but it would be
hard for him to be with all strangers with his allergies and asthma.
 Thank you so much for your help.
 Jennifer and Michael Quasha

*Id.* at ¶ 27. Mr. Badala responded and said, "I honestly don't know what I can do, I will talk with

the group and get back to you." *Id.* at  ¶ 27.

 On January 16, 2019, Mrs. Quasha spoke with Mr. Daniel Prieto, the Deputy Leisure

Services Administrator for the City of Palm Beach Gardens, who denied the requested

accommodation and informed Mrs. Quasha that there was nothing that could be done, they would

not sweep out the dugouts, and they would not stop selling peanuts during the game.  *Id.* at ¶ 28.

Mr. Prieto further suggested that he could transfer H.Q. to the North Palm Beach League. *Id.*

Because the requested accommodation was denied, Mrs. Quasha requested and received a refund

of the registration fee for T-ball. *Id.* at ¶ 30.

 At this point, Ms. Quasha contacted the city councilmembers and complained about the

situation. *Id.* at ¶ 32. They pledged their assistance to resolve it with the city manager and the

PBGYAA, but there was no response after April 3, 2019.  *Id.* at ¶ 32. Consequently, on April 15,

2019, Ms. Quasha filed a formal 504 ADA and Title II complaint to the City of Palm Beach

Gardens' ADA Coordinator, Stephen J. Stepp. *Id.* at ¶ 33. Through the investigation, Ms. Quasha

advised the ADA coordinator that the issue was the contact with peanuts, and that H.Q. could not

be in a dugout with tossed peanut shells, peanut oil and fallen peanuts.  *Id.* at ¶ 35.

 On May 9, 2019, Mrs. Quasha received a formal response to her ADA/504 grievance, and

the City informed Ms. Quasha that H.Q. would not be able to receive the same accommodation for

the spring 2019 T-ball season that he had in the Fall 2018 T-ball season, and included the following

reasons:

> a. Due to the increase in players and teams in the spring league compared to the
> fall, it would be too difficult to make this accommodation work.
> b. H.Q. should play in a league at a park in North Palm Beach, Florida since they
> do not sell concessions and it would be safer for H.Q.
> c. Having H.Q. play in the PBGYAA league would constitute a threat to himself
> due to the amount of peanuts around the field.

*Id.* at ¶ 37.  The final accommodation offer the city was willing to make was for the concession

stand to have brooms for parents and volunteers to use and that the City would install a sign that

informed "patrons that children with food allergies are present and encouraging them to place their

peanut shells into trash receptacles." *Id.* at ¶ 38. Ms. Quasha and her husband rejected this

accommodation request because it would prevent H.Q. from playing T-ball with his friends and

the opportunity to carpool with members of the community. *Id.* at ¶ 39.  Moreover, H.Q. does not

have any friends that play in the league in North Palm Beach and has never been to that park. *Id.*

at ¶ 40. It is important to Ms. Quasha that her son play T-ball with his friends and not a group of

strangers and in their own city where Mrs. Quasha other children participate in soccer and dance

at the same time. *Id.* at ¶ 41.

### III.    MEMORANDUM OF LAW

In this action under the Americans with Disabilities Act and Section 504 of the

Rehabilitation Act, injunctive relief is the predominant relief.  In order to issue an injunction under

the ADA, this Court applies the same factors used in any other case in which an injunction is

sought. *Wilson v. Broward County, Fla.*, 2008 U.S. Dist. LEXIS 20017, *4 (S.D. Fla. Mar. 14,

2008).A plaintiff seeking injunctive relief must establish (1) the likelihood of success on the

merits; (2) an irreparable injury; (3) the balance of the hardships between the plaintiff and

defendant shows that an injunction is warranted; and (4) an injunction is not contrary to the public interest. *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1208 (11th Cir. 2008).

### A.  Substantial Likelihood of Success on The Merits

Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12131-12165, provides at §12132 that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity." "Public entities" include local governmental agencies like the City of Palm Beach Gardens. A qualified individual with a disability is an individual who, with or without reasonable modifications rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity. 42 U.S.C. § 12131(2).

The ADA prohibits discrimination against a disabled person by reason of the person's disability. *See* 42 U.S.C. § 12132. To state a claim under Title II of the ADA, Plaintiff must allege: (1) that he is a qualified individual with a disability; (2) that he was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity or otherwise discriminated against by such entity; (3) by reason of such disability. *Id.*; *Shotz v. Cates*, 256 F.3d 1077, 1079 (11th Cir. 2001).

### 1.  H.Q. is a Person with a Disability Protected By the Broad Scope of the ADA Amendments Act

The Americans with Disabilities Act, as amended, defines the definition of disability more broadly and H.Q. easily meets the requirements to establish that he is a person protected by the statute. Under the ADA, term "disability" has a three-pronged definition. To establish disability

under ADA, plaintiff must show either (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1).  H.Q. falls with the first and second definitions of disability.

In the Defendant's motion to dismiss (DE 7), the City attempted to argue that due to the episodic nature of a peanut allergy, that it was not a disability. When Congress amended the Americans with Disabilities Act in 2008 it explicitly broadened the definition of disability to include episodic impairments and specifically rejected Supreme Court decisions narrowly interpreting the definition of disability. Pub. L. No. 110-325, § 2 (2008). *See* 42 U.S.C. § 12102(4)(D) ("an impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active."). Under the ADAAA, a person is covered if he or she has "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). Major life activities include, but are not limited to, sleeping, eating, breathing, concentrating, and thinking. *Id.* § 12102(2)(A); 28 C.F.R. § 35.108(c)(1)(i). Major life activities also include the operation of major bodily functions including but not limited to "functions of the immune system", digestive, bowel, neurological, respiratory and endocrine functions. 42 U.S.C. § 12102(2)(B); 28 C.F.R. § 35.108(c)(1)(ii). Post-amendment case law shows that individuals with food allergies can be individuals with a disability. Most recently, in *J.D. v. Colonial Williamsburg Found.*, No. 18-1725, 2019 U.S. App. LEXIS 16325 (4th Cir. May 31, 2019), the Fourth Circuit found that an eleven year old boy with a gluten-free diet was a person with a disability. The boy experienced digestive symptoms when he ingested gluten. *Id.* at 2-3. The court squarely rejected the appellant's argument that "J.D. can simply avoid foods that contain gluten," and found that "the district court was required to consider the effects of J.D.'s impairment

when he's not on a strict gluten-free diet. … As the district court observed, J.D. submitted extensive evidence about the serious consequences to his health when he ingests gluten. That J.D. can avoid these symptoms when he maintains a gluten-free diet is immaterial because it runs counter to the clear mandate of the ADAAA." *Id.* at 11-12. Other cases around the country have held similarly. *See, e.g.*, *Peterson v. Kelly Servs.*, No. 2:15-CV-0074-SMJ, 2016 U.S. Dist. LEXIS 138529, at *17-*18 (E.D. Wash. Oct. 5, 2016) (holding that celiac disease can constitute a disability); *Phillips v. P.F. Chang's China Bistro*, No. 5:15-cv-00344-RMW, 2015 U.S. Dist. LEXIS 159474, at *9-*10 (N.D. Cal. Nov. 23, 2015) (same); *O'Reilly v. Gov't of the V.I.*, Civ. No. 11-0081, 2015 U.S. Dist. LEXIS 84407, at *17 (D.V.I. June 30, 2015) (holding that an allergy can constitute a disability under the ADA).

Further, as the defendant has knowledge of and a similar accommodation has been granted previously, H.Q. has a "record of" a disability. Federal regulations define the "record of impairment" provision to mean that an individual "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." *Carper v. TWC Servs.*, 820 F. Supp. 2d 1339, 1353-54 (S.D. Fla. 2011) (quoting 29 C.F.R. § 1630.2(k)). The record-of-impairment standard is satisfied only if H.Q. actually suffered a physical impairment that substantially limited one or more of his major life activities. *Hilburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1229 (11th Cir. 1999). In this matter, the City had notice and provided an accommodation in the past after his mother advised him of his disability and his allergies.

**2. The PBGYAA T-Ball League is a Program or Service of the City of Palm Beach Gardens**

Despite its active involvement in the accommodation process since 2017, the City claims, both in their answer and in their good faith conference prior to this motion that they have no responsibility over what the PBGYAA sells in the concession buildings in the park owned by the City, in the City park across from City Hall.

"[T]he language of Title II's antidiscrimination provision does not limit the ADA's coverage to conduct that occurs in the 'programs, services, or activities' of [a public entity]" but that "it is a catch-all phrase that prohibits all discrimination by a public entity, regardless of the context[.]'" *Bledsoe v. Palm Beach Cnty. Soil & Water Conservation Dist.*, 133 F.3d 816, 822 (11th Cir. 1998) (*citing Innovative Health Systems, Inc. v. City of White Plains*, 117 F.3d 37, 44-45 (2d Cir.1997)); *see also Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1085-86 (11th Cir. 2007) (noting that the Eleventh Circuit "already has explained that the final clause of § 12132 'protects qualified individuals with a disability from being subjected to discrimination by any such entity, and is not tied directly to the services, programs, or activities of the public entity"). The operation of a Title III facility with a Title II entity's park is the regulatory definition of a Title II entity's program and service. The regulations for Title II provides in part, as follows:

(1) A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability-

28 CFR § 35.130(b)(1). In the appendix to the regulations, the Department of Justice states as follows:

[T]itle II applies to anything a public entity does. . . . All governmental activities of public entities are covered, even if they are carried out by contractors. For example, a State is obligated by [T]itle II to ensure that the services, programs, and activities of a State park inn operated under contract by a private entity are in compliance with [T]itle II's requirements.

28 C.F.R., Pt. 35, App. B.  The Department of Justice's guidance also has a particular focus on

parks as well:

> **II-1.3000 Relationship to title III.** Public entities are not subject to title III of the
> ADA, which covers only private entities. Conversely, private entities are not
> subject to title II. In many situations, however, public entities have a close
> relationship to private entities that are covered by title III, with the result that certain
> activities may be at least indirectly affected by both titles.
> ILLUSTRATION 1: A privately owned restaurant in a State park operates for the
> convenience of park users under a concession agreement with a State department
> of parks. As a public accommodation, the restaurant is subject to title III and must
> meet those obligations. The State department of parks, a public entity, is subject to
> title II. The parks department is obligated to ensure by contract that the restaurant
> is operated in a manner that enables the parks department to meet its title II
> obligations, even though the restaurant is not directly subject to title II.[7]

Under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104

S. Ct. 2778, 2782, 81 L. Ed. 2d 694 (1984), "considerable weight should be accorded to an

executive department's construction of a statutory scheme," unless the regulations are "arbitrary,

capricious, or manifestly contrary to the statute." The DOJ regulations provide clearly that Title II

encompasses employment actions against public entities. The regulations are neither "arbitrary,

capricious, nor manifestly contrary to the statute." *Id.* at 844, 104 S. Ct. at 2782.

While there are some cases which distinguish licensing an entity from having an active

responsibility for its operation, *see e.g. Schwarz v. Villages Charter Sch., Inc.*, 165 F. Supp. 3d

1153 (M.D. Fla. 2016), this is not a licensing case. Similar cases involving city parks' recreation

services to person with disabilities closely demonstrates the obligations a city has regarding

recreational services to persons with disabilities. In *Concerned Parents*, the disabled plaintiffs sued

their city for eliminating recreational programs for persons with disabilities and pursued a

---

[7] The Americans with Disabilities Act Title II Technical Assistance Manual - Covering State and Local Government
Programs and Services (1993), found at https://www.ada.gov/taman2.html#II-1.3000 (last accessed 8/4/2019)

preliminary injunction to reinstate the programs. *Concerned Parents to Save Dreher Park Ctr. v. City of W. Palm Beach*, 846 F. Supp. 986, 988 (S.D. Fla. 1994). This Court found that the city owned and operated the particular park at issue and the city chose to provide recreational services to persons without disabilities, thus the ADA required that the city provide equal access to recreational services to persons with disabilities. *Id.* at 988-89, 991-92.

In this matter, the City clearly outsourced its sports leagues for City residents and uses their tax dollars to subsidize the leagues, and discriminates against non-residents. The activities are held only on City park fields, and operated by City residents, in conjunction with city officials.  This is more of a program, service or benefit than either the State Park Inn in the DOJ's regulations or the privately-owned restaurant in the DOJ's technical assistance manual.

### 3. The City of Palm Beach Gardens denied the benefits of the services, programs, or activities of a public entity.

As stated above, the City cannot deny a child with a disability "any aid, benefit, or service, may not, directly or through contractual, licensing or other arrangements," 28 CFR § 35.130(b)(1). By denying H.Q. an accommodation and then directing that he should play in the North Palm Beach league, the City discriminated against H.Q. by breaching most of the prohibitions against discriminations stated in 28 CFR. § 31.130(b):

> (1) A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability --
> (i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service;
> (ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;
> (iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;
> (iv) Provide different or separate aids, benefits, or services to individuals with disabilities or to any class of individuals with disabilities than is provided to others

> unless such action is necessary to provide qualified individuals with disabilities
> with aids, benefits, or services that are as effective as those provided to others;
> (v) Aid or perpetuate discrimination against a qualified individual with a disability
> by providing significant assistance to an agency, organization, or person that
> discriminates on the basis of disability in providing any aid, benefit, or service to
> beneficiaries of the public entity's program;
> ….
> (3) A public entity may not, directly or through contractual or other arrangements,
> utilize criteria or methods of administration:
> (i) That have the effect of subjecting qualified individuals with disabilities to
> discrimination on the basis of disability;
> (ii) That have the purpose or effect of defeating or substantially impairing
> accomplishment of the objectives of the public entity's program with respect to
> individuals with disabilities; or
> …
> (4) A public entity may not, in determining the site or location of a facility, make
> selections --
> (i) That have the effect of excluding individuals with disabilities from, denying
> them the benefits of, or otherwise subjecting them to discrimination; or
> (ii) That have the purpose or effect of defeating or substantially impairing the
> accomplishment of the objectives of the service, program, or activity with respect
> to individuals with disabilities.

Thus, private entities, contracted to provide services for public entities, must also comply with the

obligations set forth in the ADA. *See Hunter v. District of Columbia*, 64 F. Supp. 3d 158, 169

(D.D.C. 2014) (collecting cases of public entities that have an obligation to ensure that its private

contractors comply with Title II of the ADA).

When deciding whether a person with a disability, who has requested an accommodation

for their disability, has been discriminated against because of their disability, courts look to

determine three factors: (1) whether the requested modification is "necessary" for the disabled

individual; (2) whether it is "reasonable"; and (3) whether it would "fundamentally alter the

nature" of the public accommodation. *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 683 n.38 (2001).

The plaintiff bears the burden of proving that the requested modification is both necessary and

reasonable; the defendant bears the burden of proving that the requested modification would be a

fundamental alteration. *See Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 507–08 (4th Cir. 2016); *A.L. ex rel. D.L. v. Walt Disney Parks & Resorts US, Inc.*, 900 F.3d 1270, 1292 (11th Cir. 2018).

### a.   The request accommodation is necessary and reasonable

In conducting an inquiry into whether an accommodation is necessary, courts have used a "like experience" standard, meaning that public accommodations must start by considering how their facilities are used by nondisabled guests and then must take necessary and reasonable steps to provide disabled guests with a "like experience." *A.L. v. Walt Disney*, 900 F.3d at 1296; *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012). This approach is consistent with the ADA, which "guarantees the disabled more than mere access to public facilities; it guarantees them 'full and equal enjoyment.'" *Baughman*, 685 F.3d at 1135 (quoting 42 U.S.C. § 12182(a)). In *Bhogaita v. Altamonte Heights Condo. Ass'n*, 765 F.3d 1277, 1288 (11th Cir. 2014), the Eleventh Circuit defined "a 'necessary' accommodation is one that alleviates the effects of a disability." *Id.* In the present case, H.Q. can demonstrate that his requested accommodation is necessary to his equal enjoyment of little league baseball at Gardens Park. Here, H.Q. alleges that he has a disability that prevents him from being exposed to peanuts. The evidence shows that H.Q. can easily sick when exposed peanuts. If he avoids peanuts, then it is necessary.

In addition to being necessary, "[f]acilities are not required to make any and all possible accommodations that would provide full and equal access to disabled patrons," but "need only make accommodations that are reasonable." *Baughman*, 685 F.3d at 1135. A modification is reasonable "that, at least on the face of things, it is feasible for the [facility] under the circumstances." *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1262 n.16 (11th Cir. 2007) (*citing Reed v. Lepage Bakeries, Inc.*, 244 F.3d 254 (1st Cir. 2001)) Reasonableness is generally a fact-

specific inquiry, id., asking whether the specific modification is "reasonable under the circumstances." *Martin*, 532 U.S. at 688.

In a similar recent case, *J.D. v. Colonial Williamsburg Found.*, No. 18-1725, 2019 U.S. App. LEXIS 16325 (4th Cir. May 31, 2019), the Fourth Circuit determined the reasonableness of an accommodation for celiac disease. *J.D.*, 2019 U.S. App. at *19. In *J.D.*, a child with celiac disease, or gluten sensitivity, requested that he eat his own food at a restaurant that held an entertainment show while guests dined. *Id.* at *5-7. When the restaurant refused, the child's parents sued. *Id.* at *7. Ultimately, the court found that the request was reasonable because the child had gotten sick from foods that claimed to be gluten-free and it cost the restaurant nothing to allow the accommodation. *Id.* at *20-21, *24. In the present case, there is nothing that would prevent the City from directing that PBGYAA from selling peanuts during the day of H.Q.'s games, and prohibiting peanuts in the dugout.

### b. **The requested accommodation is not a fundamental alteration**

The Title regulations require that changes be made unless they would necessitate "a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens." *Shotz v. Cates*, 256 F.3d 1077, 1081 n.4 (11th Cir. 2001) (quoting 28 C.F.R. 35.150(a)(3)). There are some issues, such as allowing a high school student an extra year of eligibility in a high school athletic program to five years as it would be a fundamental alteration to the eligibility requirements of a four-year high school program. *Pritchard v. Fla. High Sch. Ath. Ass'n*, 371 F. Supp. 3d 1081, 1087 (M.D. Fla. 2019); *See also McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 462 (6th Cir. 1997) (fining that a waiver of the eight-semester rule would work a fundamental alteration to a high school sports program." However, this is similar to the suspension of the "walking rule" in a PGA tournament would not work a fundamental

alteration as it is not an essential attribute to the game itself. *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 683, 121 S. Ct. 1879, 149 L. Ed. 2d 904 (2001). Accepting that "the purpose of the walking rule is to subject players to fatigue, which in turn may influence the outcome of tournaments," the Court held that the purpose of the rule was "not compromised in the slightest" by the accommodation because it was uncontested that Martin "easily endures greater fatigue even with a cart than his able-bodied competitors do by walking." *Id.* at 690. Thus, the modification did not fundamentally alter the tournament.

While peanuts and crackerjacks are traditional in baseball, it is not an essential or fundamental part of the game. More and more major league ballparks are providing peanut-free areas for persons with severe allergies.[8] A minor league team, the Hartford Yard Goats, have decided to stop selling peanuts entirely at their ball park, the Dunkin' Donuts Park.[9]

In the present case, H.Q. can establish that his request for an accommodation was reasonable and was not a fundamental alteration to the little league baseball program. The sale of peanuts at a T-Ball game is not a necessary component to the program in the slightest. Indeed, the city can easily replace the sale of peanuts with the sale of sunflower seeds, a food that H.Q. is not allergic to and is another baseball favorite food.

### c.  Irreparable Injury

In the Eleventh Circuit, a likelihood of success on the merits goes hand in hand with a determination of irreparable harm, as "irreparable injury may be presumed from the fact of discrimination and violations of [civil rights] statutes." *Gresham v. Windrush Partners, Ltd.*, 730

---

[8] http://blog.nimasensor.com/2018/07/16/major-league-peanut-free-ballparks/
[9] https://www.foodandwine.com/news/hartford-yard-goats-ballpark-peanut-ban;
https://www.usatoday.com/story/money/2019/02/12/peanuts-cracker-jack-banned-minor-league-park-pro-sports-first/2846703002/

F.2d 1417, 1423 (11th Cir. 1984); *see also United States v. Hayes Int'l Corp.*, 415 F.2d 1038, 1045 (5th Cir. 1969) ("[I]rreparable injury should be presumed from the very fact that the statute has been violated."). The same court went on to hold "that when a plaintiff who has standing to bring suit shows a substantial likelihood that a defendant has violated specific [civil rights] statutes and regulations, that alone, if unrebutted, is sufficient to support an injunction remedying those violations." *Id.* Such a showing also gives rise to a presumption of future violations and harm. *See Silver Sage v. City of Desert Hot Springs*, 251 F. 3d 814, 826-827 (9th Cir. 2001). An injury is "irreparable," as required for a preliminary injunction, only if it cannot be undone through monetary remedies. *League of Women Voters of Florida, Inc., v. Detzner*, 314 F. Supp. 3d 1205, 1223 (N.D. Fla. 2018). In *Concerned Parents*, this Court found that an irreparable injury existed where a city eliminated recreational programs for persons with disabilities because "[t]hese programs, prior to their elimination, were contributing to a sense of emotional and psychological well-being, the injury for which injunctive relief is appropriately granted." *Concerned Parents*, 846 F. Supp. at 992. *See also Lugo v. 141 NW 20th St. Holdings, LLC*, 878 F. Supp. 2d 1291, 1295-96 (S.D. Fla. 2012) (noting that the ADA provides injunctive relief when a disabled person is prevented from the use and enjoyment of property to which they are entitled to equal use).

In the present case, H.Q. can demonstrate that he suffered an irreparable injury because he was discriminated against because of his disability. As such, this Court should find that H.Q. will suffer an irreparable injury because he has and will continue to lose his sense of emotional and psychological well-being by being excluded from T-Ball.  There are no hardships that the City will suffer if they cease this discrimination.  There are no funds threatened or incurred.

### d. Public Interest

Regarding the public interest prong, granting injunctive relief advances the public interest because it "benefit[s] not only the claimant but all other persons subject to the practice or rule under attack." *Sandford v. R.L. Coleman Realty Co., Inc.*, 573 F.2d 173, 178 (4th Cir. 1978). Defendants' interest in continuing discriminatory practices by excluding children with allergies from its services and program is undoubtedly subservient to the preemptive effect of the federal civil rights laws as enacted by Congress. *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 51 (1974) ("Title VII's strictures are absolute and represent a Congressional command that each employee be free from discriminatory practices.'). Congress and the courts have emphatically declared that the public interest is served by effective enforcement of the federal civil rights laws. In *Concerned Parents*, the city argued that the public's interest lies in maintaining a balanced budget, however, this Court ultimately concluded that "[t]he equality of all persons is the underlying principle of the ADA, and one which the public has a strong interest in promoting," satisfying the last and final requirement for preliminary injunctions. *Id. See also Doe v. Judicial Nominating Comm'n*, 906 F. Supp. 1534, 1545 (S.D. Fla. 1995) (noting that "the public interest requires that discrimination against the disabled not be tolerated"); *Caron Found. of Fla., Inc. v. City of Delray Beach*, 879 F. Supp. 2d 1353, 1374 (S.D. Fla. 2012) (declaring that "it is not against the public interest to enjoin discrimination against individuals with disabilities").

**WHEREFORE**, Plaintiff, JENNIFER QUASHA, on behalf of her son, H.Q., respectfully requests the Court immediately enjoin Defendant CITY OF PALM BEACH GARDENS, FLORIDA to direct and enforce a prohibition on selling peanuts on days that H.Q. will play T-Ball, and for such further relief as this court deems just and equitable.

*Quasha v. City of Palm Beach Gardens, FL*
*Motion For Preliminary Injunction*
*Page 21 of 21*

### Certificate of Conference

Pursuant to Local Rule 7.1 the undersigned has conferred with all parties or non-parties who may be affected by the relief sought in the motion in a good faith effort to resolve the issues raised in the motion and the Defendant opposes the relief sought herein.

By:     /s/ *Matthew W. Dietz*
        Matthew W. Dietz, Esq.
        Fla. Bar No.: 0084905

### Expedited Motion Certificate

This Motion is being filed as an Expedited Motion. The registration for T-Ball league has already begun and the T-Ball league starts in mid-September.

By:     /s/ *Matthew W. Dietz*
        Matthew W. Dietz, Esq.
        Fla. Bar No.: 0084905

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 5, 2019, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send notice of electronic filing to all parties and counsel of record in the herewith service list, or in some other authorized manner for those counsel or parties who are not authorized to receive notices electronically.

DISABILITY INDEPENDENCE GROUP, INC.
2990 Southwest 35th Avenue
Miami, Florida 33133
Tel:  (305) 669-2822
Fax:  (305) 442-4181
Email: Mdietz@justDIGit.org
       aa@justdigit.org

By: s/ *Matthew W. Dietz*
MATTHEW W. DIETZ, ESQ.
Florida Bar No.: 0084905