# EXHIBIT "A"

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
CASE NO: 19-CV-80825-DMM**

JENNIFER QUASHA, on behalf of her
son, H.Q., a minor

    Plaintiffs

vs.

CITY OF PALM BEACH GARDENS, FLORIDA

    Defendants

_____/

## **PRELIMINARY INJUNCTION**

THIS CAUSE comes before the Court on Motion by Plaintiff, JENNIFER QUASHA, on behalf of her son, H.Q. for an Expedited Motion for Preliminary Injunction, (D.E. 12) filed on August 5, 2019. Defendants have not timely responded pursuant to Local Rule 7.1(c), within 14 days of filing the motion, but has submitted motion for enlargement of time and an answer which outlines their defenses to this matter. As the Defendant has not submitted a response to this motion, the Court has reviewed Plaintiff's Expedited Motion, the declaration and exhibits attached thereto, and is otherwise fully advised in the premises.

In the instant motion, the Plaintiff urges the Court to issue a preliminary injunction to cease the sale of peanuts at the Defendant City of Palm Beach Gardens, Florida ("City") at Gardens Park when her six-year old son, who has a severe peanut allergy, plays T-Ball in the Palm Beach Youth Athletic Association (PBGYAA) league. The Plaintiff exhausted all *voluntary* administrative preconditions to obtain relief, and after filing her claims, and receiving an answer from the City, files a motion requesting immediate relief from this court. Her relief is granted, as follows:

In this action under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act, injunctive relief is the predominant relief. In order to issue an injunction under the ADA, this Court applies the same factors used in any other case in which an injunction is sought. *Wilson v. Broward County, Fla.*, 2008 U.S. Dist. LEXIS 20017, *4 (S.D. Fla. Mar. 14, 2008). A plaintiff seeking injunctive relief must establish (1) the likelihood of success on the merits; (2) an irreparable injury; (3) the balance of the hardships between the plaintiff and defendant shows that an injunction is warranted; and (4) an injunction is not contrary to the public interest. Angel Flight of Ga., Inc. v. Angel Flight Am., Inc., 522 F.3d 1200, 1208 (11th Cir. 2008).

The ADA prohibits discrimination against a disabled person by reason of the person's disability. See 42 U.S.C. § 12132. To state a claim under Title II of the ADA, Plaintiff must allege: (1) that he is a qualified individual with a disability; (2) that he was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity or otherwise discriminated against by such entity; (3) by reason of such disability. Id.; Shotz v. Cates, 256 F.3d 1077, 1079 (11th Cir. 2001).

**Facts:**

H.Q. is a six year old boy who lives in Palm Beach Gardens, Florida. When he was four, H.Q. tried cashews and became red around the mouth, experienced throat tightness and was transported to the hospital in an ambulance. When he has an allergic reaction, H.Q.'s throat closes up and/or he gets hives. His lips and eyes can become swollen and his throat tightens up. After verifying the severe allergy, H.Q.'s mother, Jennifer Quasha was taught an anaphylaxis action plan in the event that H.Q. came in contact with an allergen, which includes the use an epinephrine pen and other medications.

2019 would be the second year in which H.Q. participated in the PBGYAA league. In the Fall of 2018, when plaintiff discovered that there practice of throwing the peanut shells on the floor of the dugout and benches in the dugout, she requested an accommodation to Seth Abrams, who was the president of PBGYAA Baseball that stated:

> Hello, my son [H.Q] is deadly allergic to peanuts. He is playing t ball this season and I notice the peanut shells all over the dugout and at the concession stand. The lady who works the concession suggested I email you. I've heard they've taken the peanuts away in the past for kids with allergies. Thank you so much.
> Jennifer and Michael and Quasha.

12-1 at ¶ 17. When Mr. Abrams denied the accommodation and state that he could not stop selling peanuts because "its baseball", plaintiff complained to the City of Palm Beach Gardens. Id. At that time, Ron Ferris, the city manager of the City of Palm Beach Gardens, offered three accommodations: (1) the dugouts be swept each day prior to first use of the day; (2) all of H.Q.'s Fall T-ball games be scheduled as the first game of every game day; and (3) the park not sell any peanuts until the conclusion of H.Q.'s games. Id. at ¶ 18. When the same request was made for the spring of 2019 or the Fall of 2019, it was denied. Plaintiff's first denial was on January 16, 2019, through Mr. Daniel Prieto, the Deputy Leisure Services Administrator for the City of Palm Beach Gardens, who denied the requested accommodation and informed Mrs. Quasha that there was nothing that could be done, they would not sweep out the dugouts, and they would not stop selling peanuts during the game. Id. at ¶ 28. Mr. Prieto further suggested that he could transfer H.Q. to the North Palm Beach League. Id. Then, at this point, Ms. Quasha contacted the city councilmembers and complained about the situation. Id. at ¶ 32. They pledged their assistance to resolve it with the city manager and the PBGYAA, but there was no response after April 3, 2019. Id. at ¶ 32. Consequently, on April 15, 2019, Ms. Quasha filed a formal 504 ADA and Title II complaint to the City of Palm Beach Gardens' ADA Coordinator, Stephen J. Stepp. Id. at ¶ 33.

Through the investigation, Ms. Quasha advised the ADA coordinator that the issue was the contact with peanuts, and that H.Q. could not be in a dugout with tossed peanut shells, peanut oil and fallen peanuts. Id. at ¶ 35.

On May 9, 2019, Mrs. Quasha received a formal response to her ADA/504 grievance, and the City informed Ms. Quasha that H.Q. would not be able to receive the same accommodation for the spring 2019 T-ball season that he had in the Fall 2018 T-ball season, and included the following reasons:

> a. Due to the increase in players and teams in the spring league compared to the fall, it would be too difficult to make this accommodation work.
> b. H.Q. should play in a league at a park in North Palm Beach, Florida since they do not sell concessions and it would be safer for H.Q.
> c. Having H.Q. play in the PBGYAA league would constitute a threat to himself due to the amount of peanuts around the field.

Id. at ¶ 37. The final accommodation offer the city was willing to make was for the concession stand to have brooms for parents and volunteers to use and that the City would install a sign that informed "patrons that children with food allergies are present and encouraging them to place their peanut shells into trash receptacles." Id. at ¶ 38. Ms. Quasha and her husband rejected this accommodation request because it would prevent H.Q. from playing T-ball with his friends and the opportunity to carpool with members of the community. Id. at ¶ 39. Moreover, H.Q. does not have any friends that play in the league in North Palm Beach and has never been to that park. Id. at ¶ 40.

### 1. H.Q. has a disability

The Americans with Disabilities Act, as amended, defines the definition of disability more broadly and H.Q. easily meets the requirements to establish that he is a person protected by the statute. Under the ADA, term "disability" has a three-pronged definition. To establish disability

under ADA, plaintiff must show either (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). H.Q. falls with the first and second definitions of disability.

An allergy which would cause a person to undergo anaphylactic shock including difficulty breathing is a disability. See 42 U.S.C. § 12102(4)(D) ("an impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active."); see J.D. v. Colonial Williamsburg Found., No. 18-1725, 2019 U.S. App. LEXIS 16325 (4th Cir. May 31, 2019), (finding that an eleven year old boy with a gluten-free diet was a person with a disability because he experienced digestive symptoms when he ingested gluten.) Furthermore, because plaintiff requested and was provided the same accommodation previously by the PBGYAA, and the City had notice of the accommodation, there is a "record of such an impairment."

2. **H.Q. was denied the benefits of the services, programs, or activities of a public entity or otherwise discriminated against by such entity; by reason of such disability**

The program or service offered by the City of Palm Beach Gardens are the city fields and the programs and services that it, or its agents or licensees provide on its fields. The City recognizes the Palm Beach Youth Athletic Association (PBGYAA) as the "City's recognized provider of youth recreational sports leagues."[1]  Under Title II of the ADA, the City cannot deny a child with a disability "any aid, benefit, or service, may not, directly or through contractual, licensing or other arrangements," 28 CFR § 35.130(b)(1).  By denying H.Q. an accommodation, and then directing that he should play in a field or a league outside of the City because of the absence of peanuts,

---

[1] Fall 2019 Gardens Life Brochure, p. 9, found at https://www.pbgfl.com/DocumentCenter/View/12408/Gardens-Life-Brochure-FALL-2019-PDF, last accessed 8/4/2019

violates the ADA by excluding an otherwise qualified boy from the programs or activates of the City of Palm Beach Gardens.

**Defenses:**

Even though the Defendant did not submit a response to the Motion for Preliminary Injunction, they had asserted several defenses in their Motion for Enlargement, dated August 8, 2019 (DE 13), reply filed on August 12, 2019 (DE 16) and their Answer and Affirmative Defenses (DE 11), each of which does not alter the likelihood of success on the merits:

**(1) The City has the non-delegable duty to comply with the Americans with Disabilities in their parks.**

Prior to each of the prohibitions in the regulations under Title II of the ADA, the regulation provides as follows: "A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability …."28 CFR § 35.130(b)(1). Private entities, contracted to provide services for public entities, must also comply with the obligations set forth in the ADA. *See Hunter v. District of Columbia*, 64 F. Supp. 3d 158, 169 (D.D.C. 2014) (collecting cases of public entities that have an obligation to ensure that its private contractors comply with Title II of the ADA). "[T]he language of Title II's antidiscrimination provision does not limit the ADA's coverage to conduct that occurs in the 'programs, services, or activities' of [a public entity]" but that "it is a catch-all phrase that prohibits all discrimination by a public entity, regardless of the context[.]'" Bledsoe v. Palm Beach Cnty. Soil & Water Conservation Dist., 133 F.3d 816, 822 (11th Cir. 1998) (*citing* Innovative Health Systems, Inc. v. City of White Plains, 117 F.3d 37, 44-45 (2d Cir.1997)); *see also* Bircoll v. Miami-Dade Cnty., 480 F.3d 1072, 1085-86 (11th Cir. 2007) (noting that the Eleventh Circuit "already has explained that the final clause of § 12132 'protects qualified individuals with a disability

from being subjected to discrimination by any such entity, and is not tied directly to the services, programs, or activities of the public entity"). The example of a private entity that uses facilities in a public entities park is explicitly intended to be covered under the ADA. In the ADA technical service manual it provides as follows:

> **II-1.3000 Relationship to title III.** Public entities are not subject to title III of the ADA, which covers only private entities. Conversely, private entities are not subject to title II. In many situations, however, public entities have a close relationship to private entities that are covered by title III, with the result that certain activities may be at least indirectly affected by both titles.
>
> ILLUSTRATION 1: A privately owned restaurant in a State park operates for the convenience of park users under a concession agreement with a State department of parks. As a public accommodation, the restaurant is subject to title III and must meet those obligations. The State department of parks, a public entity, is subject to title II. The parks department is obligated to ensure by contract that the restaurant is operated in a manner that enables the parks department to meet its title II obligations, even though the restaurant is not directly subject to title II.[2]

In this matter, the City was involved in the accommodation process with Ms. Quasha and outsourced its sports leagues for City residents and uses their tax dollars to subsidize the leagues, and discriminates against non-residents. The activities are held only on City park fields, and operated by City residents, in conjunction with city officials.

**(2) The Accommodation would not be a Fundamental Alteration**

---

[2] The Americans with Disabilities Act Title II Technical Assistance Manual - Covering State and Local Government Programs and Services (1993), found at https://www.ada.gov/taman2.html#II-1.3000 (last accessed 8/4/2019). Under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844, 104 S. Ct. 2778, 2782, 81 L. Ed. 2d 694 (1984), "considerable weight should be accorded to an executive department's construction of a statutory scheme," unless the regulations are "arbitrary, capricious, or manifestly contrary to the statute." The DOJ regulations provide clearly that Title II encompasses employment actions against public entities. The regulations are neither "arbitrary, capricious, nor manifestly contrary to the statute." Id. at 844, 104 S. Ct. at 2782.

Title II regulations require that changes be made unless they would necessitate "a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens." Shotz v. Cates, 256 F.3d 1077, 1081 n.4 (11th Cir. 2001) (*quoting* 28 C.F.R. 35.150(a)(3)). The City has not proffered any reason why suspending the sale of peanuts during H.Q.'s game days would be a fundamental alteration in the nature of the operations of their service or program, other than peanuts are traditional in baseball. While peanuts and crackerjacks are traditional in baseball, it is not an essential or fundamental part of the game. More and more major league ballparks are providing peanut-free areas for persons with severe allergies.[3] A minor league team, the Hartford Yard Goats, have decided to stop selling peanuts entirely at their ball park, the Dunkin' Donuts Park.[4] Furthermore, the fields in North Palm Beach do not sell peanuts, and the program and service in another city, by the admission of defendant, is identical.

This case is similar to the suspension of the "walking rule" in a PGA tournament would not work a fundamental alteration as it is not an essential attribute to the game itself. PGA Tour, Inc. v. Martin, 532 U.S. 661, 683, 121 S. Ct. 1879, 149 L. Ed. 2d 904 (2001). Accepting that "the purpose of the walking rule is to subject players to fatigue, which in turn may influence the outcome of tournaments," the Court held that the purpose of the rule was "not compromised in the slightest" by the accommodation because it was uncontested that Martin "easily endures greater fatigue even with a cart than his able-bodied competitors do by walking." *Id.* at 690. Thus, the modification did not fundamentally alter the tournament. The sale of peanuts at a T-Ball game is not a necessary component to the program in the slightest. Indeed, the city can easily replace the

---

[3] http://blog.nimasensor.com/2018/07/16/major-league-peanut-free-ballparks/
[4] https://www.foodandwine.com/news/hartford-yard-goats-ballpark-peanut-ban;
https://www.usatoday.com/story/money/2019/02/12/peanuts-cracker-jack-banned-minor-league-park-pro-sports-first/2846703002/

sale of peanuts with the sale of sunflower seeds, a food that H.Q. is not allergic to and is another baseball favorite food.

**Irreparable Injury and Public Interest**

In the Eleventh Circuit, a likelihood of success on the merits goes hand in hand with a determination of irreparable harm, as "irreparable injury may be presumed from the fact of discrimination and violations of [civil rights] statutes." Gresham v. Windrush Partners, Ltd., 730 F.2d 1417, 1423 (11th Cir. 1984); *see also* United States v. Hayes Int'l Corp., 415 F.2d 1038, 1045 (5th Cir. 1969) ("[I]rreparable injury should be presumed from the very fact that the statute has been violated."). The same court went on to hold "that when a plaintiff who has standing to bring suit shows a substantial likelihood that a defendant has violated specific [civil rights] statutes and regulations, that alone, if unrebutted, is sufficient to support an injunction remedying those violations." Id. Such a showing also gives rise to a presumption of future violations and harm. *See* Silver Sage v. City of Desert Hot Springs, 251 F. 3d 814, 826-827 (9th Cir. 2001).

Regarding the public interest prong, granting injunctive relief advances the public interest because it "benefit[s] not only the claimant but all other persons subject to the practice or rule under attack." Sandford v. R.L. Coleman Realty Co., Inc., 573 F.2d 173, 178 (4th Cir. 1978). Defendants' interest in continuing discriminatory practices by excluding children with allergies from its services and program is undoubtedly subservient to the preemptive effect of the federal civil rights laws as enacted by Congress. See Alexander v. Gardner-Denver Co., 415 U.S. 36, 51 (1974) ("Title VII's strictures are absolute and represent a Congressional command that each employee be free from discriminatory practices.'). Congress and the courts have emphatically declared that the public interest is served by effective enforcement of the federal civil rights laws.

In the present case, H.Q. can demonstrate that he suffered an irreparable injury because he was discriminated against because of his disability. As such, this Court should find that H.Q. will suffer an irreparable injury because he has and will continue to lose his sense of emotional and psychological well-being by being excluded from T-Ball.  There are no hardships that the City will suffer if they cease this discrimination.

It is therefore ORDERED and ADJUDGED that:

1. Pursuant to Rule 65, Fed. R. Civ. P., Defendant, its agents, employees, lessees, as well as those acting in concert with them, are  enjoined from selling peanuts on days that H.Q. will play T-Ball at Gardens Park, and will continue their practice of sweeping the dugouts in the morning prior to the start of use of the fields in Gardens Park.

2. Defendant, its agents, employees, lessees, as well as those acting in concert with them, are enjoined from discriminating on the basis of H.Q.'s disability in his participation in the services programs of the Defendant.

3. Defendant is directed to serve this order on the Palm Beach Gardens Youth Athletic League board members, as well as employees of the Defendant who operate Gardens Park.

4. The Order expires upon final judgment of this court, or other time as ordered by this court.

5.  Defendants motion for enlargement of time (DE 13) is DENIED as moot.

DONE and ORDERED in chambers in West Palm Beach, Palm Beach  County, Florida on this ____ day of August, 2019.

_____
Honorable Donald M. Middlebrooks
United States District Judge

cc. All Counsel of Record