IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO.: 19-CV-80825-DMM

JENNIFER QUASHA, on behalf of
her son, H.Q., a minor,

    Plaintiffs,

vs.

CITY OF PALM BEACH GARDENS,
FLORIDA,

    Defendant.
_____/

DEPOSITION OF DANIEL PRIETO

Pages 1 through 43

Wednesday, November 13, 2019
1:10 p.m. to 2:29 p.m.
U.S. Legal Support, Inc.
444 West Railroad Avenue, Suite 300
West Palm Beach, Florida

Reported By:
KIMBERLEY A. ROSS

U.S. LEGAL SUPPORT
www.uslegalsupport.com



1      A.   So after speaking with Dr. Quasha, I
2  reached out to the Palm Beach Gardens Youth Athletic
3  Association, Seth Abrams first, discussed the
4  situation.  I had to ask all the questions as to
5  what happened.
6           He gave me his answer, which was they did
7  not deny any play of anybody, but then he told me
8  that they asked for -- to stop the sale of peanuts.
9           He also came up with the idea to create
10 some -- you know, we discussed what sort of
11 accommodations could be made.  And he said that he
12 would work to -- with the schedulers to see if they
13 could do some of the items that were presented.
14     Q.   Okay.  Let's go back a little bit.  In the
15 fall of 2018, you spoke with Dr. Quasha?
16     A.   Uh-huh.
17     Q.   And can you tell me about that
18 conversation that you had with Dr. Quasha in the
19 fall of 2018.
20     A.   I have notes on the subject, but I don't
21 have them in front of me.
22     Q.   You have notes in your possession?
23     A.   Not in my possession currently.
24     Q.   Is it in your office?
25     A.   Yes.

```
 1        Q.   Okay.
 2        A.   I have a timeline that I created
 3   established that had a summary of the call, but it
 4   was more -- the very first call was investigatory
 5   asking the situation.  He explained the situation as
 6   he knew it, which that didn't turn out to be exactly
 7   right.
 8        Q.   Well, tell me what your understanding is
 9   of the investigation as he knew it.
10             MR. ALEXANDER:  Object to form.
11   BY MR. DIETZ:
12        Q.   I'm sorry.  Let me rephrase that.
13   Withdrawn.
14             Tell me about what he told you that you
15   later found out was not accurate.
16        A.   That H.Q. was kept out of playing baseball
17   and not permitted to play.
18        Q.   And what did he ask you?  What --
19   withdrawn.
20             What other information did he give you
21   during that call?
22        A.   Did Dr. Quasha?
23        Q.   Correct.
24        A.   That he just wants his son to play
25   baseball.
```

```
 1       Q.    Did he ask to have a peanut-free field in
 2  the fall of 2018?
 3       A.    No.
 4       Q.    Did he ask for -- that PBGYAA to stop
 5  selling peanuts in the fall of 2018?
 6       A.    To my recollection, yes.
 7       Q.    Did he make any other requests in the fall
 8  of 2018?
 9       A.    I can't recall offhand.
10       Q.    But it's in your notes?
11       A.    The summary of the call is in my notes.
12       Q.    When you say "your notes," is it notes,
13  like, a notepad or is it in a computer system?
14       A.    It's typed up.  I don't know if it's a
15  saved document, but I definitely have a printout of
16  it.
17       Q.    And you would type out notes every time
18  that you had work -- that you had interaction on
19  their issues?
20       A.    When it seemed like there was going to be
21  legal proceedings, I went through and summarized the
22  notes.
23       Q.    So after you had that conversations and
24  you spoke to Seth Abrams and you asked him
25  questions, what questions and what answers did you
```

1  call?
2      A.  I assume to try to resolve the situation
3  in the same manner that was done in 2018, the fall
4  of 2018.
5      Q.  Okay.  And what did Dr. Quasha accuse you
6  of doing?
7      A.  Not sweeping out park -- basically, a lot
8  of the things that were done.  But he accused me
9  specifically, that I recall, of not being willing to
10 sweep out dugouts.
11         And I think he mentioned -- I don't
12 recall.  I couldn't tell you exactly the
13 conversation without reviewing those notes.
14     Q.  Are these in your notes?
15     A.  Perhaps, yeah.
16     Q.  And --
17     A.  I remember I explained at one point,
18 whether it was that call or another call, that the
19 league -- he accused us of trying to ship him --
20 ship H.Q. to North Palm Beach.  That's not accurate.
21         It's the same league played by the same
22 players and the same teams and the same individuals
23 just at a different park.
24     Q.  I will get to that.  We haven't gotten to
25 that part yet.

```
 1        A.    Mid-January.
 2        Q.    Mid-January.  And in the first
 3   conversation, who was the conversation with?
 4        A.    When I was made aware?
 5        Q.    Correct.
 6        A.    The notes have a timeline that explain
 7   exactly who communicated and when everything was
 8   done.  So I can't recall that explicitly, like, how
 9   it came to my desk, whether it was a call from
10   Dr. Quasha or not.
11        Q.    Did you provide that timeline to anybody
12   in the City of Palm Beach Gardens?
13        A.    It was actually established by
14   Charlotte Presensky.  She was the author of it.
15        Q.    So she authored the timeline?
16        A.    Yeah.
17              MR. DIETZ:  Do you have a copy of that
18        timeline?
19              MR. ALEXANDER:  No.
20   BY MR. DIETZ:
21        Q.    So before receiving the call from H.Q.'s
22   father, you had conversations with
23   Charlotte Presensky about this matter?
24        A.    No.
25        Q.    Who did you have a conversation with prior
```

```
 1   to speaking to H.Q.'s father on January 16th?
 2        A.   There was no conversation.  Just I believe
 3   it was brought to my attention by either Seth Abrams
 4   or Tony Badala, the PBGYAA, that there was further
 5   request for accommodations and that it could not
 6   be -- could not be accommodated reasonably.
 7        Q.   Okay.  And was this brought before to your
 8   attention via a telephone call or by email?
 9        A.   Oh, I don't recall.
10        Q.   Do you maintain -- did you receive -- do
11   you receive any emails from the PBGYAA?
12        A.   Do I receive emails --
13        Q.   Correct.
14        A.   -- from the PBGYAA?
15        Q.   Yes.
16        A.   Yes.
17        Q.   Did you receive emails regarding this
18   topic from persons at the PBGYAA?
19        A.   I may have been added to emails, but I
20   don't believe I actually received.  If I did, it was
21   one or two of them.
22        Q.   So what did Tony Badala or Seth Abrams
23   tell you in their conversation prior to January 16th
24   in your conversation with Dr. Quasha?
25        A.   That there was a reasonable accommodation
```

```
 1   to support the play of H.Q. in North Palm Beach,
 2   which is on -- one mile away, and it's in the same
 3   league because the North Palm Beach league isn't
 4   strong enough to have a full league so they
 5   inner-league.
 6        Q.   What was the start of the conversation
 7   after, "Hello, Daniel.  How are you doing today?  I
 8   spoke to -- Dr. Quasha came," and what happened?
 9   What did they tell you about Dr. Quasha's request?
10        A.   I don't recall that conversation in detail
11   from January.
12        Q.   And that would be in your notes?
13        A.   If there was a conversation, it would be
14   in the summary.
15        Q.   Okay.
16             MR. DIETZ:  I'm going to hold this
17        deposition open until I receive those notes.
18             MR. ALEXANDER:  You can say you are.  I
19        don't agree to it.  There was no duces tecum
20        request; so he wasn't asked to bring anything
21        with him today.
22             MR. DIETZ:  He did it as part of his job,
23        and I did a request for it.  So to the extent
24        that you say employees can't -- aren't supposed
25        to give their documents to a duces tecum
```

```
 1        A.    To fill in the data points, to assist in
 2   the author -- the authoring of the document.
 3        Q.    On page 3 on the bottom, it states "The
 4   second map shows the distribution of the
 5   4,800 households served by our largest partner, the
 6   Palm Beach Gardens Youth Athletic Association."
 7              And then if you turn to page 5, it says
 8   "The PBGYAA coordinates all of the major youth
 9   sports including inclusion offerings for children
10   with disabilities."
11        A.    Yes, sir.
12        Q.    What connection does the PBGYAA have with
13   the City, if you know?
14        A.    They are the youth provider of sports.
15        Q.    So they are the youth provider of sports
16   for the City; correct?
17        A.    Yeah.
18              MR. DIETZ:  I have no further questions.
19        Thank you.
20              I'll also -- for the record order.  I'm
21        going to hold open the deposition.  I'm not
22        concluding it until I receive the notes or
23        other emails that were not provided.
24
25
```

```
 1                    CROSS-EXAMINATION
 2   BY MR. ALEXANDER:
 3        Q.   Mr. Prieto, I just want to make one thing
 4   clear.  Exhibit 1, one of the things you
 5   communicated to Mr. Quasha was that you wanted him
 6   to communicate with the PBGYAA instead of with you
 7   going forward; is that right?
 8        A.   That's right.
 9        Q.   Did Mr. Quasha use any completely
10   inappropriate, disrespectful, crude and profane
11   language in dealing with you prior to that email?
12        A.   Yes, he did.
13        Q.   And why don't you state for the record
14   what Dr. Quasha said to you.
15        A.   He called me a fucking asshole.
16        Q.   When someone talks to you like that, would
17   it be your desire not to interact with them going
18   forward?
19        A.   Yeah.  Absolutely.
20        Q.   And was that one of your motivations for
21   telling Dr. Quasha that he should deal with the
22   PBGYAA going forward because he could not interact
23   with you in a respectful, professional, and adult
24   tone?
25        A.   Yes.
```