UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**CASE #: 9:19-cv-80825-DMM**

JENNIFER QUASHA, on behalf of
her son, HQ, a minor,

      Plaintiff,

vs.

CITY OF PALM BEACH GARDENS,
FLORIDA,

      Defendant.

_____/

**DEFENDANT, CITY OF PALM BEACH GARDENS',
MOTION FOR SUMMARY JUDGMENT**

Defendant, CITY OF PALM BEACH GARDENS, by and through its undersigned counsel, pursuant to Rule 56, Fed.R.Civ.P. and Local Rule 56.1, S.D.Fla.L.R., moves for the entry of summary judgment, and states:

*INTRODUCTION*

Jennifer Quasha, as mother of 6-year-old HQ, filed suit against the CITY alleging that her child endured discrimination in violation of the Americans With Disabilities Act and Rehabilitation Act when an independent youth sports league, the Palm Beach Gardens Youth Athletic Association (PBGYAA) did not ban the sale of peanuts at the ballpark. The CITY denied those allegations and asserted that it had no control over the lawful snack items sold by the PBGYAA at the concessions, and that Plaintiff had already afforded reasonable accommodations which allowed for meaningful participation. Those included an agreement to provide daily maintenance to the dugouts, to install signage warning of the presence of children

1

with food allergies, signage directing peanuts shells to be properly disposed of, providing warning to HQ's coaches and parents of his allergies (so that they, in turn, could maintain a peanut-free zone/dugout and instruct the children), and to promote safety in every reasonable, feasible manner. When HQ's parents were still unsatisfied, the PBGYAA offered to relocate HQ's PBGYAA games to a nearby facility without concessions, despite the PBGYAA's firm belief that even if it temporarily stopped peanut sales, it would have no effect on the overall presence of peanuts in the park since patrons bring large quantities of their own snacks rather than purchase from the concession stand.

Early in the litigation, Plaintiff moved for a Preliminary Injunction, which the Court denied, finding that Plaintiff failed to demonstrate that his requested accommodation was reasonably related to allowing HQ to safely play, and that the accommodations already in place were reasonable.  (D.E. 30).  The court noted, however, that the record could develop in a manner that provided better support for Plaintiff's claims.  Discovery in this case though certainly has not been kind to Plaintiff's position.  Rather, it crystallized in favor of the defense with respect to numerous issues.  For one, it turns out that HQ is not even allergic to peanuts, and that his mother has incorrectly assumed he was for years based upon a reaction to a cashew. *Statement of Facts, ¶¶4-6.*  Cashews and peanuts though have no predictive value towards each other, and when HQ's blood was analyzed for Immunoglobin E to peanuts, it was completely negative.  *Id.*  In addition, the PBGYAA staff have confirmed that the PBGYAA manages the concessions free from City involvement or input, and that the City, in fact, has no right to direct the PBYAA to stop selling peanuts.  *Statement of Facts, ¶9.*  Finally, the record confirmed that the measures in place prior to the institution of this action provided HQ with an opportunity to fully participate in baseball.  The coaches/parents/volunteers were made aware of his allergies

2

and would inform the children to keep peanuts away from HQ and utilize basic common sense around him.   This is precisely what HQ's elementary school does to limit the chance for HQ's exposure to peanuts.   *Statement of Facts, ¶3.*   HQ's elementary school does not ban peanuts in the cafeteria or, in fact, even at HQ's very lunch table.   *Id.*

## BASIS FOR SUMMARY JUDGMENT

1.      Defendant asserts an entitlement to judgment as a matter of law on numerous grounds.   First, HQ is not a qualified individual with a disability as it relates to his requested accommodations in this case.   According to his own board-certified allergist, Dr. Elena Perez, although HQ may have some food allergies, it is highly unlikely that he is allergic to peanuts. Inasmuch as peanuts are the sole issue in this case, HQ lacks a qualifying disability vis-à-vis his claim for relief.

2.      Even if Plaintiff had a qualifying disability, the City of Palm Beach Gardens is not liable for the refusal of the PBGYAA to cease selling peanuts.   The record amply demonstrates that the PBGYAA manages all aspects of the concession program, free from input or directive from the City, which it expressly advised would not accept even if given.   As a minimal licensing agent, the PBGYAA is solely responsible for its own decisions.   *Statement of Facts, ¶9.*

3.      As the Court previously determined in denying Plaintiff's request for a preliminary injunction, the requested accommodations are not reasonably calculated to protect HQ or allow him to participate in baseball.   The record demonstrates that a temporary stoppage of peanut sales would have no appreciable effect, if any, on the presence of shells in an open park, where patrons routinely bring their own snack items.   The parents/coaches/volunteers' actions in policing the presence of peanuts in HQ's actual dugout (an already existing practice)

3

provided ample protection for HQ, especially where shells and peanut dust, even if they existed in HQ's dugout, are highly unlikely to cause an allergic reaction in the first instance (particularly to HQ, who is not allergic to peanuts).   *Statement of Facts, ¶¶6, 12-13.*

4.      In addition, the Court previously found that banning the sale of peanuts, the salient accommodation at issue, was not necessary where Plaintiff had already been accommodated in other ways.   (D.E. 30, p.6).   The measures already in place, and those proposed particularly for HQ's benefit (including relocating his games to a concession-free nearby park) obviated the need to ban a common snack at baseball parks (described as "the snack of baseball), and thereby deprive everyone over the purported allergies of one.

WHEREFORE, Defendant, CITY OF PALM BEACH GARDENS, moves for the entry of summary judgment.

## A. HQ DOES NOT HAVE A DISABILITY WHICH IS PERTINENT TO THE REQUESTED ACCOMMODATIONS

In order to present a viable claim for failure to accommodate, the plaintiff must show that: (1) he is a qualified individual with a disability; (2) that he was excluded from participation or denied the benefits of a public entity's services, programs or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of Plaintiff's disability.   *Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1083 (11th Cir. 2007).   The disability must limit one or more major life activities, or there must be a record of such impairment, or being regarded as having an impairment. 42 U.S.C. §12102(1)(A)-(C).

When this court initially addressed the merits of this action and denied the request for a preliminary injunction, it accepted that HQ was deathly allergic to peanuts, as alleged within the

pleadings.   The present record though demonstrates otherwise.   According to HQ's own board-certified allergist, Dr. Elena Perez, HQ has no clinical history of allergic reaction to peanuts.   The fact that HQ years earlier had an allergic reaction to a cashew is of no consequence where the allergin components of peanuts and cashews are distinct and have no predictive value towards each other.   *Statement of facts, ¶¶4-6*.   The blood tests administered by Dr. Perez, including a complete peanut panel, demonstrate the absence of peanut allergy to a high level of medical probability.

Here, where Plaintiff is claiming that his disability is an allergy to peanuts, and seeks relief in the form of a ban on concession sales of peanuts, he cannot reasonably be deemed to be a qualified individual with a disability in this case where, in fact, he is not even allergic to peanuts and invariably would not be affected by the presence of peanuts in the park.   Notably, Dr. Perez, citing to peer reviewed studies published by the American Academy of Allergy, Asthma and Immunology, confirmed that the presence of peanut shells and dust would be subthreshold for clinical reactivity even for a peanut-allergic person, and that one with an actual peanut allergy would not be affected by peanuts unless he/she actually consumed them. *Statement of Facts, ¶6.*

Based upon the fact that HQ is not deathly allergic to peanuts, per objective medical criteria, and that proximity to peanut consumption or shells is not a trigger for anaphylaxis anyway, Plaintiff is not a qualified individual with a disability and, moreover, requires no accommodations at all.

### B. PALM BEACH GARDENS IS NOT LIABLE UNDER THE ADA FOR CONCESSIONS' DECISIONS OF THE PBGYAA

In addition to the fact that HQ is not disabled, allergic to peanuts, or in need of any accommodation to participate in youth baseball, the decision to continue to sell peanuts was not made by a public entity, as required under Title II.

The PBGYAA is an independent, 501(c)(3) non-profit entity that operates youth sports in Palm Beach County.  Part of its revenue production, which offsets dues to be paid by the community, comes through concession operations.  *Stepp Dec.,  ¶¶4-6; Statement of Facts, ¶9.* The City shares in no concession revenue and does not dictate to PBGYAA what it may sell.  Id. *The concessions are not a city program.*  Essentially, the City provides the facility, and the PBGYAA organizes and operates all aspects of the sports leagues.  The City thus falls under what numerous ADA opinions have deemed a "minimal licensing agent," which stem from the following regulation:

> A public entity may not administer a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability, nor may a public entity establish requirements for the programs or activities of licensees or certified entities that subjects qualified individuals with disabilities to discrimination on the basis of disability.  *The programs or activities that are licensed or certified by a public entity are not, themselves, covered by this part.*

28 C.F.R. §35.130(6).  Thus, a public entity is not accountable for the alleged discriminatory practices for a private company if those practices are not the result of requirements or policies established by the public entity.  *Wendel v. Fla. Dep't of Highway Safety and Motor Vehicles*, 80 F.Supp.3d 1297 (M.D. Fla. 2015). The *Wendel* case involved a lawsuit against the DHSMV when a licensed DUI school, Sunshine Safety Council, Inc., allegedly failed to accommodate a psychological disorder of a U.S. Army veteran.  The DHSMV was responsible to and did in fact

license and regulate Sunshine as a DUI school, as required by Florida law.  Nonetheless, the court found that "[a]ssuming that Sunshine did discriminate against Plaintiff because of his disability, any such discrimination cannot be attributed to the [DHSMV]; rather it is attributable to Sunshine alone" because "[a] licensor is not accountable for any alleged discrimination of its licensee."  Id. at 1305.  Thus, while the Court agreed that DHSMV "cannot administer a licensing program in a manner that subjects persons with disabilities to discrimination, the programs of licensees of a public entity are not themselves covered by 28 C.F.R. §35,130(b)(6).

The Honorable Marcia Morales Howard, Middle District of Florida, authored an extensive opinion (62 pages, not counting the 77 footnotes) in a case strikingly similar to this case, but for the fact that the recreational participants fall on the other side of the age spectrum. In *Schwarz v. The Villages Charter School, Inc.*, 165 F.Supp.3d 1153 (M.D. Fla. 2016), the plaintiff in a retirement community claimed discrimination when he was denied a sign language interpreter while attending Residential Lifestyle Group (RLG) activities organized under the auspices of a governmental entity, the Village Community Center Community Development District (VCCDD).   In The Villages, a district such as VCCDD owns the recreational department facilities.  Id. at 1161.  It effectively licenses/permits RLGs, which are like clubs, to offer activities.  Only Villages residents may be members of RLGs, and these clubs do not have to a pay any rental fees to use Recreation Department facilities because they already do so through their taxes (amenities fees).    RLGs are encouraged by the governmental entity and may only exist with entity approval.  The VCCDD advertises the RLGs, and reviews and approves them based upon applications, after insuring they comply with VCCDD criteria, such as limiting membership to residents, experience, minimal number of annual meetings, identification requirements, and keeping accurate lists of group members for the governmental entity, among

other requirements.  Id. at 1165.   So long as RLG meets the government's numerous requirements, the government will provide an organized mechanism for scheduling the RLGs (obtains permits and updates the VCCDD's website to advertise them) and provide recreation space (again, for free).  Id. at 1168.

The residents in the Villages testified that the government played a vital role in forming and organizing RLGs, including controlling club leaders, and supervising the RLG meetings. Id. at 1168-69.   Village residents also use RLGs because they are advertised by the governmental entity, including in Recreation News.  Id. at 1169.  Notwithstanding the Village's in-depth involvement in the formation and control of RLGs, it formally abrogated responsibility to make ADA accommodations for RLG events occurring on government property because they were not programs of services of the government.   Id. at 1170.

The court agreed with this limitation, and held that although RLGs are permitted by the entity and utilize governmental recreation facilities at no cost, they are not government programs where the Districts are not involved in the content of RLG programs and derive no income from RLG events.   Although the District facilitates the use of recreation centers, ensures compliance with many guidelines, and schedules meeting times and places, RLGs are not a program or activity of the District, insulating the District from ADA liability:

> Upon review, the Court is of the view that Plaintiffs' interpretation of this regulation is too broad.  Liability under this regulation must still hinge on the fact that the program, service or activity subject to the alleged discriminatory 'methods of administration' is a program, service or activity of the public entity.  Ultimately, the facts establish that while the Districts facilitate the formation and logistical functions of RLG programs and activities, the RLG programs and activities are district from those offered by the District themselves.  A such, the District cannot be liable for the RLG's alleged failures to accommodate with respect to the RLG programs, activities and events.

8

*See also, Noel v. New York City Taxi & Limousine Comm'n*, 687 F.3d 63 (2d Cir. 2012)(public entity is not accountable for discriminatory practices of a licensee if those practices are not the results of requirements established by the public entity); *Tyler v. City of Manhattan*, 849 F.Supp. 1429, 1441 (D. Kan. 1994)("Although City programs operated under contractual or licensing arrangements may not discriminate against qualified individuals with disabilities see, 28 C.F.R. 35.130(b)(6), '[t]he programs or activities of licensees or certified entities are not themselves programs or activities of the public entity merely by virtue of the license or certificate'"); *T.W. v. Jacobo*, 2014 WL 129056 at *1 (N.D. Fla., Jan. 13, 2014)(granting motion to dismiss ADA claim brought against public entity on grounds that it had no ADA liability for its licensed hospitals).

Here, as in the above cases, the City of Palm Beach Gardens has its own Recreation Department and recreational programs, of which Daniel Prieto is the Deputy Administrator. Simply because the City permits the PBGYAA to run youth sports at its recreational facility does not permit it to micromanage all aspects of the PBGYAA such as the nature of snack items sold at its concessions, nor is it liable for PBGYAA's concession decisions, even if they are deemed discriminatory.  The decision of whether to sell peanuts is not a requirement or policy of the City.  It permits use of the facility, and PBGYAA controls all aspects of play and concessions. *See, e.g., Lang v. Oregon Shakespeare Festival Ass'n*, 2013 WL 5944184 (D. Or. 2013)(complaint dismissed against City who made lands available to non-profit theater company that allegedly discriminated since the theater program was not a service, program or activity of the City).[1]

---

[1]        The above-cited cases, including Lang, are cited with approval by the Middle District of

### C. PLAINTIFF'S REQUEST TO BAN PEANUT SALES IS NOT REASONABLE WHEN OTHER REASONABLE ACCOMMODATIONS WERE OFFERED WHICH ALLOWED FULL PARTICIPATION.

In addition to the threshold issue of the City's non-liability for alleged discriminatory concession decisions of PBGYAA, Plaintiff's request for an ***unreasonable*** accommodation is fatal to her claim.   Even it is incorrectly assumed that the PBGYAA peanut concessions are a City program or function, and that HQ is allergic to peanuts (when he is not), Plaintiff's request to ban sales, permanently or temporarily, is not a request for a reasonable accommodation. Notably, when an accommodation is requested, the public entity need not provide equal access to the requesting individual, but instead only "meaningful access" to the program.   *Medina v. City of Cape Coral*, 72 F.Supp.2d 1274, 1278 (M.D. Fla. 2014).   Just because Mom and Dad refuse to enroll HQ in T-Ball unless on their specific terms, does not mean the PBGYAA (and certainly not the City) is depriving HQ of meaningful access.   "When an individual already has 'meaningful access' to a benefit to which he or she is entitled, no additional accommodation, reasonable or not, need be provided by [the governmental entity]."   *Id. (citing, A.M. ex rel J.M. v. NYC Dep't of Educ*, 840 F.Supp.2d 600, 679 (E.D.N.Y. 2012), *aff'd sub non*, 513 Fed. Appx. 95 (2d Cir. 2013), *cert denied sub nom*, 134 S.Ct. 809 (2013).   Importantly, an entity need only provide "reasonable accommodations," not optimal ones finely tuned to the requesting person's preferences.   *Medina*, 72 F.Supp.2d at 1279 (*citing, Nunes v. Mass. Dep't of Corrections*, 766 F.3d 136, 146 (1st Cir. 2014); *see also, Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997)("[U]nder the ADA a qualified individual with a disability is not

---

Florida, also applying 11th Circuit precedent, in <u>Schwarz</u>.

entitled to the accommodation of her choice, but only to a reasonable accommodation.")(internal quotation marks omitted).

In *Medina*, the mother of 5-year-old A.M., a type 1 diabetic, sued the City alleging that A.M. was denied meaningful access to summer camp because the City refused to provide insulin injections to A.M.  The plaintiff contended that as single mother working full-time, she could not come to the camp each time A.M.'s glucose levels fell out of range, and thus the City's denial precluded A.M.'s participation.   Defendant, City, moved for summary judgment asserting that it had already reasonably accommodated A.M. in accordance with the ADA.  The parties, on summary judgment, agreed that A.M. was a qualified individual with a disability, leaving the court to decide whether A.M. was subjected to discrimination because of her disability.   After noting that a governmental entity is not required to provide *every* requested accommodation, but instead only those that provide meaningful access, it held that the City did not discriminate where it had employed measures other than providing insulin injections, in order for A.M. to attend camp.  That A.M. might miss activities, a meal, or spend time differently at the camp because of his disability does not mean she was denied meaningful access.  Id. at 1278-79.  In closing, the court acknowledged that if Cape Coral further altered its diabetes policy to add insulin injections, A.M. would then enjoy "equal access"; however that is not the standard, and the court received enough evidence that A.M. was reasonably accommodated in other ways.

In *Todd v. Carstarphen*, 236 F.Supp.3d 1311 (N.D. Ga. 2017), a blind, single mother sued and sought a preliminary injunction against the Atlanta Independent School System for refusing to transport her young children to school.   Todd contended that, even though her young children lived in a walking zone, she was entitled to an accommodation based upon disability. The school system worked with Todd, and offered alternatives, including having the children

join a walking pool, but Todd, like the Quashas here, just did not want to hear any suggestions or potential resolutions other than her specific demand.   The Court though recognized that offering less than a plaintiff's precise demands does not mean that meaningful access has been denied. Id. at 1329.   When conducting the requisite "fact-specific inquiry," what the School District provided was enough to be effective for the children to attend school.   *Id*. at 1336 (*citing, Stewart v. Happy Herman's Cheshire Bridge, Inc.,* 117 F.3d 1278, 1286 (11th Cir. 1997)("[U]nder the ADA a qualified individual with a disability is not entitled to the accommodation of her choice, but only to a reasonable accommodation.").   Thus, the court found it reasonable to deny a blind, single mother's children transportation, given to so many other area children, because she lived too close to the school to be entitled to bussing.

In the instant case, Plaintiff falsely claims that HQ is allergic to peanuts and needs to avoid them while in a sprawling baseball complex with 8 fields.   But, according to the mother's Declaration, HQ has never had an allergic reaction to peanuts.   *D.E. 12-1, ¶6.*   Plaintiff fails to identify any occasion, similar occasion, or risk from simply being in a large park where others, off of his field and outside of his dugout, are eating peanuts away from him. Indeed, in ¶11 of her Declaration, she affirmed (but not truthfully) that her son is at risk only by eating peanuts or putting his hand in his mouth after handling them.   She does not claim others eating peanuts away from him, or that the aroma of peanuts traveling through the air from afar, or peanut dust triggers a reaction.   If the dugout is swept out, and no one eats peanuts or purposely throws shells on the floor during HQ's games, then there is virtually zero risk that he will consume a peanut or touch one with his hands and then stick them into his mouth.   A swept out dugout would not have peanut shells on the ground, but even if it did, HQ would be wearing shoes and the prospect of having an anaphylactic reaction to *peanut shells and residue* is highly unlikely,

12

even if he were to encounter them.   *Statement of Facts, ¶¶4-6.*   An allergic reaction is triggered by consumption of a peanut, not from proximity to debris from others eating peanuts.   *See, Medina*, 72 F.Supp.2d at 1278 (court took into account the unlikeness of an adverse occurrence to a child in assessing whether governmental entity's accommodation was reasonable).   Here, Plaintiff's theory of how HQ could become ill is ***significantly less likely*** than the diabetic child in Medina requiring insulin where that child had actually required three (3) insulin injections. *Id.*   Three actual insulin injections over time meant the occurrence was unlikely, and this played a key role in the Court's determination that it was not a necessary or reasonable accommodation. Here, HQ has no clinical history of allergy to peanuts, his bloodwork shows the absence of such an allergy, he has never actually become ill from airborne peanut aroma or peanut shells on the ground, and his own physician, citing to medical studies, affirmed that an allergic reaction from airborne peanut dusk is "miniscule" and "highly unlikely."   *Statement of Facts, ¶6.*

The Plaintiff contends that unless peanut sales are barred for roughly 90 minutes on HQ's gamedays (roughly the time of his games and practices), then he cannot safely play baseball in the park.   Plaintiff fails to provide any support for this notion other than rank conjecture and speculation.   First, it has not been shown that ceasing sales of peanuts during HQ's games will cause any decrease in the presence of peanuts in the area he needs to occupy: his dugout and field.   Those with superior knowledge of the facilities and patrons, including PBGYAA President, Anthony Badala, and Baseball President, Seth Abrams, testified that a temporary halt on peanut sales would have no effect on the overall presence of peanuts and peanut-related debris (which, again, are highly unlikely to trigger a reaction anyway) within the park.

*Statement of Facts, ¶13.*  People could still buy peanuts earlier in the day, or bring their own, which they do quite regularly.

Second, Plaintiff has not shown that precluding everyone in the park, playing and watching on 7 other baseball fields, from consuming peanuts is a reasonable solution where HQ only occupies a small part of the overall facility.  As Mr. Badala and Mr. Abrams have confirmed, informing parents of a child's food allergies has always proven sufficient.  The parents, coaches and volunteers are there for the children, and have always acted to protect a child with an actual allergy issue.  *Statement of Facts, ¶14.*  Plaintiff fails to demonstrate that the measures already in place (those before suggesting play in the other PBGYAA location 1.3 miles away) were not effective enough.  The PBGYAA representatives, in turn, confirm that in employing those measures, there has never been an adverse incident.  *Statement of Facts, ¶12.*

Even if HQ were allergic to peanuts, and even assuming that peanut dust and shells trigger allergic reactions, HQ was provided ample protection by virtue of his dugout being swept before he entered, and the adults giving instruction to the children, and precluding the consumption of peanuts near HQ.  Notably, at HQ's elementary school where he consumes a daily meal (unlike at baseball, where no meals are served), HQ's classmates are permitted to eat foods which could cause HQ an allergic reaction.  *Statement of Facts, ¶3.*  The 6-year-old classmates though receive instruction from their teacher, Mr. Galluci, that HQ has an allergy and that they should exercise caution around HQ.  The PBGYAA measures already in place, and even before the suggestion of game relocation to North Palm Beach, were at least as protective of HQ as those at Marsh Point Elementary, where peanuts and peanut products may be freely consumed in the school cafeteria, including at HQ's own lunch table.  Plaintiff has not sought a

peanut ban at the school, and in fact does not even request that HQ eat lunch at the school's peanut-free table.  *Id.*  Plainly, the PBGYAA's existing policies and practices obviated the need for any particular accommodations for HQ.  Even so, the PBGYAA offered to schedule HQ's games at a nearby ballpark, which was entirely reasonable, and afforded HQ the ability to fully participate in PBGYAA sports.

### D.  THERE WAS NO NECESSITY TO BAN PEANUT SALES AT GARDENS PARK IN ORDER FOR HQ TO MEANINGFULLY PARTICIPATE.

As this Court noted in its Order Denying Preliminary Injunction, "for an accommodation to be necessary, it must provide disabled individuals with a 'like experience' to non-disabled individuals." *D.E. 30, p.6.*  Where accommodations already in place, or offered accomplish that objective, "facilities are not required to make the preferred accommodation of plaintiff's choice."  *Id., citing, A.L. by and through D.L. v. Walt Disney Parks & Resorts,* 900 F.3d 1270, 1296 (11th Cir. 2018).  A disabled individual may be accommodated in various ways, which need not be the precise manner requested.  *Tennessee v. Lane*, 541 U.S. 509, 511 (2004).  Finally, the court noted that a public entity need not employ all means to accommodate, and that the proposed accommodations need not eliminate all difficulty for a disabled individual.  *D.E. 30, p.6.*

The present record, more than the limited record as of the Order Denying Preliminary Injunction, amply supports that existing measures and proposed accommodations allowed HQ meaningful participation in PBGYAA baseball.  Unbeknownst to the Court and City as of issuance of D.E. 30, HQ actually did not require any accommodations since he is not allergic peanuts, and that even if he were, shells and dust are highly unlikely to trigger an allergic reaction anyway.  *Statement of Facts, ¶¶4-6.*  Even if it were incorrectly assumed though that

15

HQ could be at risk by the presence of peanut shells, Plaintiff was offered numerous accommodations which eliminated virtually any risk. The City offered to educate and inform HQ's coaches and parents that he had a food allergy. The City offered to install signage in the park alerting to food allergies, and directing the proper disposal of peanut shells. The City offered to continue with daily maintenance of dugouts, and to provide brooms at the concession stand for any parent, coach or volunteer to utilize if concerned about peanut shells in HQ's dugout. Finally, and despite that peanut shells will be present throughout the park even if not sold at the concessions (since patrons routinely bring their own), the PBGYAA offered to schedule HQ's games at North Palm Beach, which has been described as a perfectly acceptable facility. *Statement of Facts, ¶10.*

With respect to the last accommodation offered of relocating HQ's games and practices, this Court noted that "[a]lthough it is not the accommodation which Plaintiff requests, it appears to [the Court] that it would be a reasonable one and would provide HQ with an experience that is, in all significant respects, identical to the experiences of other T-ball players." *D.E. 30, p.7.* Certainly, the record has not developed in any fashion which would refute the Court's inclinations, authored when the Court presumed a serious peanut allergy, and that peanut shells/debris might actually pose a serious risk to HQ.

Based upon the foregoing, Defendant is entitled to summary judgment as a matter of law.

16

<u>**CERTIFICATE OF SERVICE**</u>

      I HEREBY CERTIFY that on this 13th day of January, 2020, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system or by email to all parties. I further certify that I either mailed the foregoing document and the Notice of Electronic Filing by first class mail to any non CM/ECF participants and/or the foregoing document was served via transmission of Notice of Electronic Filing generated by CM/ECF to any and all active CM/ECF participants.

BY:    */s/E. Bruce Johnson*
          E. BRUCE JOHNSON
          FLA. BAR NO. 262137
BY:    */s/Scott D. Alexander*
          SCOTT D. ALEXANDER
          FLA. BAR NO. 057207
          JOHNSON, ANSELMO, MURDOCH,
          BURKE, PIPER & HOCHMAN, P.A.
          **Attorneys for Defendant, City**
          2455 East Sunrise Boulevard, Suite 1000
          Fort Lauderdale, FL 33304
          954/463-0100 Telephone
          954/463-2444 Facsimile
          Johnson@jambg.com
          Young@jambg.com
          Alexander@jambg.com

17

## SERVICE LIST

**MATTHEW W. DIETZ, ESQ.**
DISABILITY INDEPENDENCE GROUP, INC.
2990 SW 35th Avenue
Miami, FL 33133
(305) 669-2822 (Phone)
(305) 442-4181 (Fax)
mdietz@justdigit.org
aa@justdigit.org

————————————————

**E. BRUCE JOHNSON, ESQ.**
**SCOTT D. ALEXANDER, ESQ.**
JOHNSON, ANSELMO, MURDOCH,
BURKE, PIPER & HOCHMAN, PA
**Attorneys for Defendant**
2455 E. Sunrise Blvd., Suite 1000
Fort Lauderdale, FL 33304
johnson@jambg.com
alexander@jambg.com
(954) 463-0100 (Phone)
(954) 463-2444 (Fax)

18