UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**CASE #: 9:19-cv-80825-DMM**

JENNIFER QUASHA, on behalf of
her son, H.Q., a minor,

    Plaintiff,

vs.

CITY OF PALM BEACH GARDENS,
FLORIDA,

    Defendant.
_____/

**DEFENDANT, CITY OF PALM BEACH GARDENS', CONCISE STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant, CITY OF PALM BEACH GARDENS, by and through its undersigned counsel, files its Concise Statement of Material Facts in Support of its Motion for Summary Judgment, as follows:

1. Plaintiff, Jennifer Quasha is the mother of 6-year-old, HQ, a first grade Marsh Point Elementary School student, who has participated in youth sports with the Palm Beach Gardens Youth Athletic Association (PBGYAA).

2. Plaintiff filed this action when the PBGYAA refused to cease selling peanuts, and schedule HQ's games first each day during a Spring baseball league with approximately 550 participants. *Abrams, p. 23.* As the Complaint makes clear, however, the PBGYAA offered to relocate HQ's games to a facility at North Palm Beach (where there were no concessions), continue daily cleaning of dugouts, make brooms available if a dugout needed additional

1

attention beyond routine daily maintenance, install signage alerting patrons to food allergies and directing patrons to properly dispose of peanut shells. *D.E. 1, ¶¶16, 18; Prieto Declaration, ¶3.* In addition, the PBGYAA agreed to continue its established practice of informing coaches, parents and volunteers (who are receptive and respectful of food allergies) of HQ's issue so that they, in turn, would control snack items brought to the team. This longstanding practice has proven so effective that there have been **no adverse incidents** despite that numerous children with food allergies have participated in PBGYAA sports, including baseball. *Badala, pp. 28-30; Abrams, pp. 27-30.*

3. Although HQ eats a daily meal with numerous children at Marsh Point Elementary (whereas, at PBGYAA baseball, no meals are served), Plaintiff, Jennifer Quasha, has not sought a similar school peanut ban. Quasha *falsely* testified in this case that her son's teacher, Michael Galluci, places students in the cafeteria next to HQ based upon the content of their lunches, and that Galluci conducts daily inspections of children's lunchboxes. *Quasha, pp. 7-8, 12*. Mr. Galluci affirmed though that he randomly assigns cafeteria tables, does not inspect lunches, and does not sit any particular child next to HQ. *Galluci, pp. 5-8, 10.* He, instead, without banning any food items, simply gives verbal instruction, and relies upon his 6-year-old students to adhere to it. *Id., pp. 10-11*. Peanuts and peanut products are not prohibited in the school cafeteria nor, in fact, are they even prohibited at HQ's table. *Id., pp.11-12.* Simple verbal instructions and guidance to first graders (like those provided by the PBGYAA to its adult volunteers and participating children alike) have proven effective to avoid adverse allergic incidents. *Id.* Notably, Marsh Point provides a peanut-free table, but HQ chooses (with his mother's blessing) not to sit there. *Quasha, p.7.*

2

4.      Plaintiff alleges that HQ is severely allergic to peanuts.  *D.E. 1, ¶8.*  HQ's own board-certified allergy immunologist disagrees, and thus declined to sign multiple Declarations/Affidavits presented to her by Plaintiff's counsel, Matthew Dietz, Esq., containing untrue medical assertions about HQ.  *Dr. Perez, pp. 5-9.*  HQ had a single allergic reaction as a 4-year-old to a cashew.  *Quasha, p.14.*  In addition to the fact that children outgrow allergies, ***peanuts and cashews contain entirely distinct allergen components***, and thus "cashew and peanut don't have any predictive value towards each other."  *Dr. Perez, pp. 12, 25-26.*  "An allergic reaction to cashew does not mean you're allergic to peanuts."  HQ has never ingested peanuts, and thus has no clinical history of allergy to peanuts.  *Id., pp. 9-10.*  Dr. Perez thus conducted a blood test with a complete peanut panel, which demonstrated that HQ had a ***completely negative*** Immunoglobin E (IgE) to peanuts. "Having a negative IgE to peanuts has a very high negative predictive value, which means that it is highly unlikely that [HQ] is allergic to peanuts."  *Id, p. 10.*  To go even beyond the very high predictive blood test and terminate the unfortunate saga of this child needlessly running scared from peanuts, Dr. Perez recommended the "gold standard," a *safe* graded oral food challenge (starting with small doses) under her medical supervision.  *Id., pp. 16-22, 27-28.*  Quasha has not accepted, preferring uncertainty as to whether HQ is allergic to peanuts (ostensibly just while this case is pending).

5.      Like the respective staffs of the City and PBGYAA, Dr. Perez has experienced the frustration of Jennifer Quasha doing all of the talking, interrupting, refusing to listen, jumping to conclusions, making incorrect assumptions, and alleging that others have made statements never actually uttered.  *Id., pp. 30-32; see also Badala, pp.36-37, Prieto, p. 22, Abrams, pp. 52-53 and Stepp p.29* (by analogy, discussing Quasha's incorrect knee-jerk

3

conclusion that the PBGYAA sought to ban HQ from the PBGYAA and send him to a different league in another city).

6. Dr. Perez further explained that HQ's presence near peanut shells or peanut dust presented virtually no risk of anaphylaxis. She affirmed that "the incidence of airborne peanut allergy is exceedingly rare, if at all." *Dr. Perez, p. 34.* Medical studies applying very sensitive detectors show that airborne exposure is subthreshold for clinical reactivity. *Id., p.35.* The American Academy of Allergy, Asthma and Immunology concludes that an allergic reaction from airborne peanut dust is "miniscule" and "highly unlikely." *Id., pp. 35-38.* A reaction would expectedly come from ingestion of the actual peanut only, not dust or stepping on shells while wearing shoes. *See, Ex. 6 to Deposition of Dr. Perez, "American Academy of Allergy, Asthma and Immunology, Reactions to Peanut During Air Travel, Can Anaphylaxis Be Due to Inhalation*. Indeed, if HQ actually touched peanut shells with his bare hands (which he would be unlikely to do in the first instance), even that would be unlikely to cause a reaction. *Id., pp. 38, 47-48.* Thus, per HQ's own physician, if the dugout is cleaned, and peanuts are not consumed in the dugout while he is present (per verbal instructions of the team coach…just like his teacher at school), there would be a low risk, if any.[1] *Id, p. 40.*

7. HQ has participated in T-Ball with the PBGYAA. The PBGYAA is a non-profit organization with more than 1,500 children playing in 8 recreation leagues. *D.E. 1, ¶7.* To operate an organization of this size, the PBGYAA relies upon approximately 1,000 volunteers.

---

[1] If Jennifer Quasha were genuinely concerned about peanut residue, she could sweep a dugout (which takes a mere minute) or even wipe down the bench with a Lysol wipe. Plaintiff testified that she is always present in the park when HQ is there, that she would not at all mind taking a minute to sweep a dugout if a coach, volunteer or other parent were not available to do so. *Dr. Perez, p.40; Quasha, pp. 55, 65-66.* Quasha confirmed that HQ has never had a reaction from stepping on peanuts, and that it never even occurred that someone entered his dugout eating peanuts or discarding peanut shells. *Id., pp. 73-74.* Also, she believes that City cleaned dugouts very well. *Id., p.58.*

*Badala, p. 8*. Its President, Anthony Badala, dedicates 20 hours per week, not to mention contributions of thousands of dollars annually. *Badala, pp. 6-7*. The president of the baseball division, Seth Abrams, similarly spends 20-25 hours per week on PBGYAA obligations, also without pay. Running an organization of this type is a rewarding experience. As Mr. Badala eloquently expressed:

> I have four children. Every one I groomed that way. My oldest child attends the Citadel. I made sure they stayed within the rec program both fall and spring. He had one scholarship. It didn't matter to me. He became a leader. It makes kids better kids growing up. My best friends now are the friends I made when my kids were six years old. It creates something that I've never seen anywhere else. I'll be honest with you. The PBGYAA has become something. I've seen these other programs that are out there and they fall apart because travel becomes such a main part of the program. My thing was rec with the beginning kids to make sure they are accommodated to create a positive experience for both them and the parents because I lived it. I saw what it was.

*Badala, p. 27*.

> We're talking about kids, talking about keeping them off the streets. If they promote the PBGYAA, good for them, and those kids could play within our organization. Because all we're doing is helping these kids at a young age create some kind of skill, some kind of communication process with other children, some families, communication with other families, which 99.9 times is a positive experience, so if the city promotes us and wants to use the word 'partner' in that aspect, I'm all with them.

*Badala, pp. 60-61*.

8. The PBGYAA has two seasons, fall and spring. The fall season is more for training and has significantly fewer participants (approximately 300 children). *Badala, pp. 17-18; Stepp Declaration, ¶5; Prieto Declaration, ¶1*. In the spring, however, enrollment

5

balloons to nearly double, or 550 kids. *Abrams, p. 23.* For the Fall, the PBGYAA afforded some restrictions on peanuts to appease HQ's parents. HQ played T-ball, which plays early anyway, and his games were scheduled first and peanuts were not sold until his game concluded. *Badala, pp. 19-21.* Badala agreed to this even though he did not believe halting peanut sales would have any effect on the overall peanuts consumed in the park (since parents bring peanuts and their own snack items). *Id.* Per Badala, peanuts are the "general snack of baseball, and that's just the way it has been for many years going back." *Id.* Everybody brings their own snacks, food is everywhere, and since games are early evening, parents are trying to hold kids over until dinner. *Id., p.22*.

9. The concession peanut decision for the Fall season was made solely by PBGYAA. The City does not have any input into how the PBGYAA run its leagues. The PBGYAA organizes the league, hires coaches, collects fees, assigns umpires, makes schedules and places children on teams, independently of any city input, whatsoever. *Badala, p.24; Abrams, pp. 11-16.* As for the concessions, the PBGYAA utilizes a small building on park property, but it purchases its own cooking and refrigeration equipment, purchases inventory, hires and pays concession staff, and keeps all proceeds, which it utilizes to pay staff and provide funds to give less privileged children an opportunity to participate. *Abrams, pp. 18-19; Badala, pp. 24-26.* The City does not provide, nor will the PBGYAA accept any directives on what food items to sell. *Abrams, pp. 24-26; Badala, p. 26-28.* Badala stated that if a city supervisor told him to sell Coke instead of Pepsi products, his response would be to hang up on him. *Id, p.27.* The City has no right to direct the items sold. *Id, pp. 27-28.*

10. For the Spring season, the City offered to provide numerous accommodations to

6

the Quasha family, but could not guarantee that HQ's games would be first of the day since it has no involvement, whatsoever, in the scheduling of PBGYAA games. *Stepp., pp. 23-24, Abrams, pp. 61-62.* The PBGYAA could not guarantee HQ's games would be first due to the size of the Spring league. *Id.* The City agreed though to continue with its daily maintenance of dugout cleaning. *Id., pp. 15, 18.* The City agreed that parents, coaches and volunteers on HQ's team would be fully informed that he had food allergies. *Id., p. 18; Stepp Declaration, ¶¶14-15.* Finally, the City agreed to place signs indicating that food allergies are present and directing park patrons to properly dispose of peanut shells. *Id., p.18.* As a final accommodation, the PBGYAA agreed that, since the parents were purportedly still concerned about concessions offering peanuts, that HQ's PBGYAA games could be moved to a nearby facility in North Palm Beach which had no concessions. *Stepp Declaration, ¶¶10-13; Prieto Declaration, ¶¶5-6.* North Palm Beach children participated in the PBGYAA as a combined league and so HQ would remain in the PBGYAA, with his same team, friends and coaches. *Id., p.28; Badala, pp. 35-38; Abrams, pp. 52-53; Pietro Declaration, ¶¶5-9;* The North Palm Beach baseball park contains perfectly acceptable fields, is a short distance away (approximately a block outside of Palm Beach Gardens city limits), and has no concessions. *Stepp, p. 28.* There was no difference for the children playing baseball other than that North Palm Beach did not have a concession stand. *Badala, p. 41.*

11. Although it was the goal of both the City and the PBGYAA for HQ to play and enjoy youth baseball with the PBGYAA, Plaintiff rejected the offer. *Stepp., p.13; Badala, p.40.* Plaintiff, Jennifer Quasha, not understanding the concept of interleague play, jumped to the wholly incorrect conclusion that her son would play in a different league than the PBGYAA if

his PBGYAA games were scheduled at North Palm Beach. *Quasha, pp. 31-32, 80-81*. Although her son has never had an allergic reaction to a peanut, has never tried a peanut, has never been adversely affected by peanut shells, and that she never observed anyone consume or discard peanut shells in HQ's dugout, Plaintiff elected to file suit rather than allow her son to participate in a concession-free facility. *Quasha, pp. 73-74*.

12. The PBGYAA has not agreed to ban, permanently or temporarily, the sale of peanuts during its youth baseball games. By virtue of HQ's dugout being cleaned daily, and the parents/coaches/volunteers instructing children not to consume peanuts in that dugout during his games and practices, the PBGYAA already effectively provides HQ with a safe, peanut-free zone to occupy. *Stepp Declaration, ¶18*; *Prieto Declaration, ¶10*. The parental instruction and oversight of HQ's occupied space is identical to measures already undertaken by PBGYAA in the past and, again, they are proven effective since there have been no adverse incidents despite that numerous children with peanut allergies have played in the league. *Badala, pp. 28-30; Abrams, pp. 27-30*.

13. Based upon the vast experience of the PBGYAA President (Anthony Badala), its Baseball President (Seth Abrams) and City staff that were present in the facilities far more than Plaintiff, the temporary stoppage of peanut sales would have had no effect on the presence of peanut shells in or about the park. The City's Deputy Leisure Services Director previously affirmed that stopping sales would not make HQ's dugout any safer. Peanuts could still be bought and sold prior to HQ's games, sold right up to his game start time, or brought in from the outside even under Plaintiff's proposal. *Pietro Declaration, ¶11*. The Deputy City Manager, Stephen Stepp (an individual with extensive recreational sports experience) similarly affirmed

8

that the park is an open park, and that parents routinely bring in their own snacks and drinks, including shelled and unshelled peanuts. Thus, a temporary stoppage of sales would be unlikely to offer any protection. *Stepp Declaration, ¶¶7-8.* Mr. Badala, an individual who spends a significant amount of time at the park, stated that "without a doubt" people would bring peanuts to the park if they could not purchase them there, and that stopping sales would have "zero" effect on peanut consumption and presence. *Badala, pp. 18-20.* Mr. Abrams also offered that peanuts are a popular item at the concessions because people like to eat peanuts while watching baseball. *Abrams, pp. 25-27.* Neither the PBGYAA nor the City can control outside snacks, which outnumber those sold. *Id., pp. 35-36.* The presence of peanuts is uncontrollable where peanuts are a part of baseball, and people can bring whatever legal items to the park they choose. *Badala, pp. 19-21, 34, 73; Abrams, pp. 46-47* (affirming that PBGYAA would not make a rule limiting peanuts since it could not be enforced).

14. The PBGYAA has found that the best method to address food allergy issues with children playing sports is to make the coach aware the child has an allergy, and for the coaches and volunteers to work with parents to promote safety. *Abrams, pp. 27-29.* The method of protecting HQ (whom the PBGYAA incorrectly assumed at the time actually had a peanut allergy) was identical to that of Marsh Point Elementary, i.e. make others aware and give verbal direction. The measures already in place even before HQ's PBGYAA participation were for a coach to ban peanuts from the dugout and make the allergic child's dugout an allergen-free zone. *Abrams, pp. 30-31.* Like at Marsh Point Elementary, employing common sense and giving verbal instruction, has been *tried-and-true,* and proven effective to protect youth athletes from anaphylaxis. *Badala, pp. 29-30.* Wholesale bans of popular snack items and precluding others

9

from purchasing "the general snack of baseball" were not considered reasonable or necessary by the PBGYAA in order to allow HQ to play, particularly with the North Palm Beach fields available as an alternative. *Badala, pp. 19-21, 34.*

15. The PBGYAA and City were not opposed to any other requests by Plaintiff. *Badala, pp. 30-33; Stepp, p. 18.* No requested accommodations were refused other than banning the sale of peanuts. In addition to city cleaning, if a dugout needed an additional sweep before HQ's game, any parent or volunteer could accomplish that inside of a minute through available brooms at the concessions. *Id.; Abrams, pp. 48-49.* Plaintiff made no requests, either pre-suit or in this litigation, for any additional maintenance beyond sweeping; however, Dr. Perez noted that a particularly anxious parent like Jennifer Quasha could chose to wipe the bench with a Lysol product if she had any concern. *Dr. Perez, p. 40-41.*

16. Despite the PBGYAA's refusal to cease peanut sales, HQ was registered to play in the Spring. *Quasha, p. 29.* He apparently did not participate, which was consistent with his actions even when afforded all requested accommodations for the Fall league (when peanut sales were halted). According to HQ's coach for the season in which he actually did participate, HQ only presented to play with his team for two (2) of the seventeen (17) games.

17. Finally, as to the issue of Plaintiff's desire to make a team request, and have HQ play on the same team as a child whose parents had medical training (the Aronowitz family), the PBGYAA was informed that Mr. and Mrs. Aronowitz did not desire to take on any additional responsibility for HQ, and that the PBGYAA should not make any special team requests involving them, or based upon their familiarity with HQ. *Badala, pp. 13-17.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 13th day of January, 2020, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system or by email to all parties. I further certify that I either mailed the foregoing document and the Notice of Electronic Filing by first class mail to any non CM/ECF participants and/or the foregoing document was served via transmission of Notice of Electronic Filing generated by CM/ECF to any and all active CM/ECF participants.

BY:   /s/E. Bruce Johnson
       E. BRUCE JOHNSON
       FLA. BAR NO. 262137

BY:   /s/Scott D. Alexander
       SCOTT D. ALEXANDER
       FLA. BAR NO. 057207
       JOHNSON, ANSELMO, MURDOCH,
       BURKE, PIPER & HOCHMAN, P.A.
       **Attorneys for Defendant, City**
       2455 East Sunrise Boulevard, Suite 1000
       Fort Lauderdale, FL 33304
       954/463-0100 Telephone
       954/463-2444 Facsimile
       Johnson@jambg.com / Young@jambg.com
       Alexander@jambg.com

## SERVICE LIST

**MATTHEW W. DIETZ, ESQ.**
DISABILITY INDEPENDENCE GROUP, INC.
2990 SW 35th Avenue
Miami, FL 33133
(305) 669-2822 (Phone)
(305) 442-4181 (Fax)
mdietz@justdigit.org
aa@justdigit.org

**E. BRUCE JOHNSON, ESQ.**
**SCOTT D. ALEXANDER, ESQ.**
JOHNSON, ANSELMO, MURDOCH,
BURKE, PIPER & HOCHMAN, PA
**Attorneys for Defendant**
2455 E. Sunrise Blvd., Suite 1000
Fort Lauderdale, FL 33304
johnson@jambg.com
alexander@jambg.com
(954) 463-0100 (Phone)
(954) 463-2444 (Fax)