UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE #: 9:19-cv-80825-DMM

JENNIFER QUASHA, on behalf of
her son, H.Q., a minor,

    Plaintiff,

vs.

CITY OF PALM BEACH GARDENS,
FLORIDA,

    Defendant.
_____/

**UNSWORN DECLARATION OF STEPHEN STEPP**

    I, Stephen Stepp, pursuant to 28 U.S.C. §1746(2), declare under penalty of perjury, as follows:

    1.    I am employed by the City of Palm Beach Gardens as the Deputy City Manager. I have also served as the Chief of Police in the past. One of my current duties is serving as the City's American With Disabilities Act (ADA) Coordinator. Since I became ADA Coordinator, the City commenced plans for and fully funded – at a cost of in excess of $500,000 – a special baseball field specifically designed for disabled children. This project flowed out of the City hosting the 2018 Miracle League Baseball event with All-Star major leaguer, Johnny Bench. Based upon the rewarding experience, the City elected to construct a Miracle League field of its own. This project will not only allow disabled children to participate in baseball, but it also brings disabled children together to play baseball with other community children as party of "buddy system." The City of Palm Beach Gardens takes immense pride in inclusion, and the programs and services it offered, and continues to offer children with disabilities, including wheelchair tennis and fully accessible

playgrounds.

2. In 1974, I began coaching youth sports in Miami-Dade County. I ran a large recreation facility in North Miami, which included coaching children and maintaining fields. Beginning in the 1980's and for a period of almost 30 years, I coached football, baseball, soccer and other sports on a strictly volunteer basis. I have served on the Board of Directors of several local Optimists Clubs, and commissioned football and hockey leagues. I have personal experience with the challenges of setting up, organizing and running large youths sports programs. One of my leagues had close to 1,000 participants. Given my lengthy experience of working in youth sports, and volunteering with children, it remains my desire that H.Q. participate in the Palm Beach Gardens Youth Athletic Association (PBGYAA) T-Ball league. Make no mistake, H.Q. is eligible to participate in the league and would be welcomed with open arms notwithstanding this legal action.

3. There is only one reason H.Q. has not been assigned a team for the upcoming Fall season: his parents have not enrolled him.

4. The PBGYAA is a non-profit parent volunteer organization that runs youth sports in Palm Beach Gardens. The PBGYAA has approximately 700 volunteers, and organizes sports for over 1,500 participants, with between 5,500 and 6,000 annual registrations. The PBGYAA is an incredible organization of commendable, caring people that tirelessly work weekends and late nights without pay, many after performing their day jobs. They insure that children's games are scheduled, fields are organized, teams set up, coaches hired, and that children in the community are able to participate in friendly competition, in a community setting, and in a safe, caring and wholesome environment.

5. One of the sports leagues is baseball/T-Ball, for which there are two seasons, Fall and

Spring. The Fall season has roughly 300 participants, while the Spring season runs close to 600, or nearly double. The higher enrollment in Spring makes it challenging, and sometimes not feasible to honor parental requests. The PBGYAA, which assigns teams, makes schedules, and organizes games independent of City involvement, has a firm policy of not accepting "friend requests" for children to be on the same team. In addition, because the baseball and T-Ball teams share some of the same fields, scheduling becomes a daunting task.

6. The City's role in PBGYAA is that it provides the facilities, maintains the fields/facilities for safe play, consults with the League, and permits play at the park. The PBGYAA stocks, runs, operates and sells all concessions without City oversight or input, at PBGYAA games. Those funds constitute important revenue to the League and are utilized to defray the costs of operating the programs, and to expand recreational opportunity. Because these funds defray operating costs, the league dues are, in turn, more affordable and accessible to parents, particularly those on a budget. The City does not receive any revenue from the concessions, nor does it dictate to PBGYAA what lawful items are sold.

7. For the Fall 2018 T-Ball season, the parents of H.Q. (one of the 300 children in Fall League) requested that certain allowances be made for their son because he is allergic to peanuts. The parents contacted Seth Abrams, the PBGYAA Baseball President, asking for the PBGYAA to completely ban the sale of peanuts to all players, parents, siblings, and other attendees at all games and practices. Mr. Abrams then consulted with Anthony Badala, the President of the PBGYAA, and the Quashas' request to ban all peanuts was denied. Gardens Park, after all, is an open park frequented by hundreds daily, and the PBGYAA ostensibly did not find that request reasonable. Indeed, parents routinely bring their own snacks and drinks, including shelled peanuts, unshelled

3

peanuts, peanut butter products, and other nut allergens, and those sold at the PBGYAA concessions represent just a portion of the overall peanuts consumed in the park. The City has no control over, and does not direct parents what to bring to the park, so long as it is not illegal (i.e. weapons, firearms, etc...). Mr. Badala did not agree with a ban in a large park with 8 fields, where the child simply needed a peanut-free zone, i.e. his field and dugout during his games, which the League provided.

8. Ultimately, Dr. and Mrs. Quasha came to a resolution with the PBGYAA wherein H.Q.'s games would be scheduled first each day (when the facility and dugouts had just been cleaned), parents were made aware of H.Q.'s allergy, and peanut sales were delayed until after the first game. Notably, there is less of this type of snack consumption, in general, during the first game as it is still morning time.

9. Following the completion of the Fall season, Dr. and Mrs. Quasha sought to enroll H.Q. for the much larger Spring League. As set forth in the accompanying Declaration of Daniel Prieto (Deputy Leisure Services Administrator), Dr. Quasha called the City because the PBGYAA could not guarantee the same arrangement for the much larger Spring League as it did for the Fall. Up until hearing from Dr. Quasha, the City was unaware of these discussions between the PBGYAA and Quasha family. As Mr. Prieto's Declaration further reflects, the City, through Mr. Prieto, informed Dr. Quasha that contact would be made with the PBGYAA, but that the City would continue to maintain and sweep the dugouts daily, as it had done before. If a dugout needed a sweep in the middle of the day, between games, or when city workers were not present, brooms would be provided at the nearby concession area. Quite literally, any parent, coach, or volunteer can accomplish a sufficient dugout sweep in less than a minute. It is a small area, and sweeping it

requires no special maintenance skills.

10. Upon consulting with Anthony Badala of the PBGYAA, the City learned that the PBGYAA had an excellent resolution, which made play as safe as possible for H.Q., particularly where the parents had utilized the word "deadly" in relation to his allergy. Mr. Badala advised that H.Q. would continue to participate in the PBGYAA Spring League, and that the PBGYAA would alleviate the parents' concern by scheduling H.Q.'s games at a nearby (1.3 miles away) North Palm Beach Park *that was utilized by PBGYAA*. Contrary to the false representation made in the injunction motion filed by the Plaintiff, it was *never proposed or discussed that H.Q. would transfer to another league.* Plaintiff's assertion to the contrary is either based upon failing to comprehend what they were being clearly told (multiple times), or worse, intentionally providing false sworn testimony to further the legal action.

11. In fact, the City of North Palm Beach did not have a stand alone T-Ball League. The North Palm Beach teams played in the PBGYAA. As proposed by Mr. Badala, H.Q. would continue in the PBGYAA, playing on a PBGYAA team, and against other PBGYAA competition, with the only difference being that, for safety reasons expressed by his parents, the games would be played 1.3 miles down Burns Road. *H.Q. would have played with the same children.* Indeed, when on January 16, 2019 Mrs. Quasha emailed Mr. Prieto that she understood that her son would be transferred to another league, Mr. Prieto quickly responded, "The assertions made in your January 16, 2019 email are incorrect."

12. The neighboring location, *utilized by PBGYAA,* has four (4) beautifully maintained fields and a long tradition of hosting youth recreational baseball. The salient difference, however, between Gardens Park and the neighboring facility 1.3 miles away is that the latter had no

concessions. Since the parents were concerned about concessions, having H.Q.'s games a mile down the road was entirely reasonable. To be certain, this accommodation was made solely with H.Q.'s safety and his parents' peace-of-mind at heart, and in no way did it have the purpose or intent of banishing H.Q. *He would not have been banished or treated differently than any other children*. At the T-Ball games, he would have been joined on the field by the same PBGYAA teammates he always played with, opposing players and umpires, and ostensibly the stands would have been filled with proud parents, grandparents, brothers and sisters of all players.

13. Mr. Badala explained to Mr. Prieto and me, and further advised that he had informed the Quasha family, that in the Spring League, it would not have been possible to guarantee that H.Q.'s games would always be the first scheduled game of the day. There were nearly 600 participants in Spring Baseball, almost double the Fall, and there were games for all ages, including kid pitch and coach pitch baseball, that needed to rotate on the fields. Since PBGYAA could not schedule all of H.Q.'s games first to play, the safest and most effective option was to relocate the games to another facility available to PBGYAA.

14. On April 15, 2019, the Quasha family requested that the City facilitate 3 things because of their son's peanut allergy. The first was that the dugouts would be swept before practices and games. The City agreed to the daily sweeps of the dugouts before practices and games, as it always had, including in the Fall. The parents' statement and belief to the contrary is unfounded. As stated above, if additional midday sweeps were required, anyone could simply accomplish this with brooms made available on site. A dugout sweep would not take much longer (less than a minute) than the Umpire's sweeping dirt off home plate. It did not require any special skills. It was obviously not necessary to have a City employee accomplish this exceedingly simple task. With 8

games sometimes being played at once, a City employee would not necessarily be available or know that a particular dugout required special maintenance, and the notion that one would actually need to locate and summon a maintenance worker, and have everyone wait for his/her arrival, just to sweep out a space as small as a dugout is simply preposterous.

15.     The Quasha family also requested that parents and teammates on H.Q.'s team would be notified of his allergies. Again, the City agreed.

16.     The sole remaining issue was that the Quashas wanted there to be a wholesale ban of peanut vending ***during all of H.Q.'s games and practices.*** Exhibit "A." It appears the present motion seeks much more than had been previously requested of the City in that Plaintiff now seeks a total ban on peanuts ***"prior to or during the days*** in which H.Q. plays T-Ball" which can reasonably be read as seeking a total and permanent ban. *Motion for Preliminary Injunction, p.1* (emphasis added). This request, in the estimation of the PBGYAA and City, defied logic and reason, unduly affected hundreds of others, and importantly ***would not have even remotely facilitated the outcome the parents desired, even if afforded.***

17.     For instance, if H.Q. had a 3:00 p.m.-4:30 p.m. game, the parents were seeking a peanut sale ban for that 90 minutes; however, the park would have already been open for six (6) hours, with peanut sales, as well as peanut consumption (and consumption of peanut-related products) from those that brought their own to the park all day long. If H.Q., beginning at 3:00 p.m., occupied a dugout that had just been swept out, and no one physically brought more peanuts into that dugout during his game, that would have provided the protection the parents sought, i.e. no peanuts near their son: a peanut-free zone. Someone purchasing and consuming peanuts five (5) fields over presented ***infinitely less of a hazard*** to H.Q. than wind blown transfer of peanut shells into his

dugout from peanut consumption earlier in the day (of which consumption the parents did not oppose since they only requested a halt "during [H.Q.'s] games and practices"). Also, suspending sales for that 90 minutes would not have magically removed peanuts, peanut shells, and peanut products already throughout the park. It would not have prevented the continued presence and consumption of peanuts parents brought to the park on their own.

18. What H.Q. needed was to sit in a dugout that was swept, and from that point until his game ended, have no children introduce peanuts into his dugout. We at the City had no basis to believe – and the Quashas certainly never presented any – that a 90 minute ban on peanut sales would have affected the prospects for presence of peanuts in H.Q.'s dugout one iota. For one, it was already understood that his dugout would remain a peanut-free zone during his games and practices, *something which his coaches and the parents' policed on their own*, and for which there were no issues in his previous T-Ball participation. Also, even under the Quasha proposal, peanuts could have been purchased minutes just before H.Q.'s game, and consumed anywhere within the park during his games since they only objected to *sales* during his games and practices. Their proposal solved nothing. Their proposal made no sense. Their proposal was not reasonable, and did not make H.Q.'s field or dugout any safer than it would have been without their proposal. Again, the issue was keeping his dugout and field peanut-free during his games. Their desire to impose their will upon the City, the PBGYAA, staff, parents, grandparents, players and spectators on 7 other fields, based upon entirely illogical rank conjecture was properly and reasonably denied.

19. A temporary ban on concession sales imposes a burden on the PBGYAA and its staff, but provides no tangible benefit, whatsoever, to H.Q., so long as his dugout is swept, something the City agreed to do. As indicated above, even if there were a temporary 90-minute *ban*

8

on sales, people will continue to eat peanuts they bought at the concession stand before the stoppage, or they will bring their own peanuts from home if they are intent on having peanuts and baseball go hand-in-hand, as it has for decades. The City cannot expect that no park patrons will consume peanuts and peanut products at the entire Gardens Park complex during H.Q.'s games. Patrons bring these items to the park everyday. The City can only expect that with responsible parenting and coaching, H.Q. would understand to avoid peanuts, and that his teammates would respect his allergy and not consume anything in proximity to their friend and teammate that could cause harm.

20. On behalf of the City of Palm Beach Gardens, I sincerely hope that H.Q. enrolls in the upcoming League season, and that he has a safe and wonderful experience. It is unfathomable to me, even when fully crediting the severity of H.Q.'s allergy, that his parents have elected not to enroll him over a brief, park-wide ban on peanut sales when such a ban would provide H.Q. no more protection than a simple sweeping, and minimal vigilance by parents and coaches asking children not to bring peanuts into the dugout or field during his games.

21. I declare under penalty of perjury that the foregoing is true and correct.

FURTHER DECLARANT SAYETH NAUGHT.

Dated this _16_ day of _AUG_, 2019

_/s/ Stephen Stepp_
Stephen Stepp