UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE #: 9:19-cv-80825-DMM

JENNIFER QUASHA, on behalf of
her son, H.Q., a minor,

    Plaintiff,

vs.

CITY OF PALM BEACH GARDENS,
FLORIDA,

    Defendant.
_____/

## UNSWORN DECLARATION OF DANIEL PRIETO

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury, of the laws of the United States of America that the following is true and correct.

1. I am employed by the City of Palm Beach Gardens as the Deputy Leisure Services Administrator.

2. On January 16, 2019, I received a call from H.Q.'s father, Dr. Quasha, about discussions he was having with the Palm Beach Gardens Youth Athletic Association (PBGYAA) regarding peanuts in Gardens Park. Dr. Quasha informed me that the PBGYAA would not guarantee for the Spring T-Ball season that his son's game would be played first each day. Even without him explaining further, I understood that the Spring League has significantly more participants and it was no surprise that PBGYAA could not guarantee starting times for all of H.Q.'s games.

3. I informed Dr. Quasha that I would speak with the PBGYAA about the situation, but that I was powerless to do any more for him since the PBGYAA alone handles scheduling,

concessions and the other matters for which he was having issues. The City maintained the park, and on that matter, I clarified that the City would continue to clean and sweep out dugouts at the beginning of play each day. It was not reasonable, or even marginally necessary though for the City to clean and sweep dugouts between each game. The reason for this is there are 8 fields on this one site alone, with games ending at varying times. The City could not know each time H.Q. had a game and designate a maintenance worker or workers specifically to H.Q. This was wholly unnecessary. The City would leave brooms on site where parents, coaches, volunteers and children could easily and quickly access them and sweep out H.Q.'s dugout before he occupied it. Sweeping a dugout takes somewhere between 30 seconds and one minute and can be accomplished by anyone. It would make no sense for players and coaches for H.Q.'s game to have to locate a city employee, and for everyone to wait until he could arrive to perform a task that literally anyone could have done in no time, and certainly in far less time than finding and summoning a city worker. Sweeping a dugout requires no special maintenance skills. Plaintiff's motion for injunctive relief represents that I stated that the City would not continue to maintain and sweep out the dugouts. That is untrue.

4. I was perfectly polite with Dr. Quasha. The same could not be said for him though. He was verbally abusive, threatening and concluded our conversation by calling me a *"fucking asshole"* and then hanging up. Despite Dr. Quasha's completely disrespectful language and tone, I contacted the league on behalf of H.Q. to see what could be worked out. I was not going to engage in any action or inaction that might penalize a child because of his parent's bullying and crass behavior.

5. The next day, on January 17, 2019, I contacted Mr. Anthony Badala (PBGYAA) in an effort to discuss the situation. Mr. Badala informed me that the PBGYAA had an excellent

resolution, which made play as safe as possible for H.Q., particularly where the parents had utilized the word "deadly" in relation to his allergy. Mr. Badala advised that H.Q. would continue to participate in the Spring of 2019 League, and that the PBGYAA would alleviate the parents' concern by scheduling H.Q.'s games the nearby (1.3 miles away) North Palm Beach fields, a facility used by PBGYAA.

6. I understand that Plaintiff has urged in her court filings her belief that Mr. Badala proposed removing H.Q. from the PBGYAA and having play in another league in North Palm Beach. ***This statement is untruthful.*** It was ***never proposed or discussed that H.Q. would transfer to another league.*** In fact, the City of North Palm Beach did not have a stand alone T-Ball League. The North Palm Beach teams played in the PBGYAA. When I spoke with Dr. Quasha, I informed him, as had Mr. Badala, that H.Q. would absolutely remain in the PBGYAA league, but that his games would be at the other facility, which was used by the PBGYAA, because there were no concessions. This proposal was in no way unreasonable or punitive, but instead an additional measure that would ease the parents' concerns.

7. At this time period, I also corresponded with Mrs. Quasha. She emailed me and incorrectly expressed that she understood that her son would be transferred to another league. I could not, and still cannot understand how she came to believe this as no one had ever proposed or advised her that H.Q. would do anything other than remain in the same PBGYAA league with his same friends. Accordingly, I responded in writing that "the assertions made in [her] January 16, 2019 email are incorrect."

8. Dr. and Mrs. Quasha have never been advised that H.Q. was not welcome to participate in PBGYAA T-Ball with his same friends. I am not even aware of the existence of any

3

league that could have been discussed for H.Q. to play in besides PBGYAA.

9. Mr. Badala's proposal to have H.Q.'s game at the nearby facility was in no way a punitive or discriminatory measure. Again, the parents were expressing concern over concessions and this other facility has no concessions. Problem solved. It contains four (4) fine fields that have a long tradition of hosting youth baseball in our community. Children that utilize these fields are in no way treated in an inferior manner to children that play games at Gardens Park. Of course, the parents, siblings, parents and grandparents of H.Q.'s teammates and opponents would have also been at this field with H.Q. cheering on the players, and the notion that anyone sought to "kick H.Q. to the curb" because he is allergic to peanuts is both false and preposterous.

10. Moreover, as I understood the situation from the parents, they desired a peanut-free environment in the vicinity of H.Q. during his games. Even at Gardens Park, after someone swept out his particular dugout, his coaches and the parents would always keep kids from eating peanut products in that dugout while H.Q. was there. That should suffice to create a "peanut-free zone" where H.Q. could safely occupy the park. I was never informed that receiving a waft of peanut aroma from a distance triggers any allergic reaction. The only example they provided was that H.Q. could have a reaction if he came into physical contact with peanuts or peanut residue. The suggestion to play at the nearby facility was simply another proposed accommodation by PBGYAA to what would have already been a safe situation for H.Q. if he remained at Gardens Park. The parents, however, kept pushing the issue of concessions, and that is why this suggestion was made.

11. A temporary stoppage of peanut sales, during H.Q.'s games and practices (as proposed by Dr. Quasha), would not have made H.Q.'s dugout any safer. *Even under the parents' proposal, peanuts could have been bought and sold right up to the minute of H.Q.'s game start time,*

*and thus consumed during his game by those that purchased them.* Also, parents could still bring peanuts from home or the store to the games and consume them. Gardens Park is not a peanut-free facility and given the hundreds of visitors, the City frankly could not possibly police the snack items of the hundreds of people that walk into the park with coolers and bags full of snacks for themselves and their children.

12. The notion that halting peanut sales for 90 minutes over the course of a long day would make H.Q.'s dugout safer for those 90 minutes did not make any sense to Mr. Badala, and it was PBGYAA's decision not to affect the masses in order to implement what seemed like a wholly meaningless and ineffective measure, particularly where there were other better, safer options including location change.

_____
Daniel Prieto